# 21-2445-cv

## United States Court of Appeals

*for the*

## Second Circuit

JACOB SCHWARTZ,

*Plaintiff-Appellant,*

– v. –

CITY OF NEW YORK,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

ARTHUR Z. SCHWARTZ
ADVOCATES FOR JUSTICE,
    CHARTERED ATTORNEYS
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................... 1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..... 4

STATEMENT OF THE ISSUES PRESENTED ....................................... 4

STATEMENT OF THE CASE ................................................................. 4

    A. The Proceedings Below ............................................................. 4

    B. Statement of Facts .................................................................... 5

    C. Appellant's Claims ................................................................... 12

        1. NYC Administrative Code Claim ...................................... 12

        2. Breach of Oral Contract .................................................. 13

        3. *Quantum Meruit* Claim ................................................... 14

        4. FLSA Claim ..................................................................... 14

    D. Claim for Damages ................................................................... 14

    E. The Decisions Appealed From ................................................... 15

STANDARD OF REVIEW ..................................................................... 17

SUMMARY OF THE ARGUMENT ........................................................ 19

ARGUMENT ......................................................................................... 20

    POINT I: THE MOTION TO DISMISS WAS IMPROPERLY GRANTED. . 20

New York City Administrative Code Claim ...................................................20

Common Law Claims ...................................................................................22

POINT II:  THE GRANT OF SUMMARY JUDGMENT WAS DECIDED
IMPROPERLY ..............................................................................................30

A. An Employer's Burden ..........................................................................30

B. Issues of Fact Should Have Foreclosed the Entry of Summary
Judgment on the FLSA Exemption Issues. ...........................................32

1. The Independent Judgment/Matters of Significance Exemption
Clearly Is a Fact Issue. ......................................................................33

2. The Computer Employee Exemption ...............................................40

3. Questions of Fact Abound on Both Issues. ......................................44

CONCLUSION ..............................................................................................53

CERTIFICATE OF COMPLIANCE ..................................................................54

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)..................................... 18, 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................. 17, 18

*Aulicino v. New York Dept. of Homeless Services*, 580 F.3d 73
   (2d Cir. 2009) ......................................................................................... 19, 30, 31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)............................................ 17, 18

*Biondo v. NYS Board of Parole*, 60 N.Y.2d 882 (1983)..........................................26

*Brady v. Town of Colchester,* 863 F.2d 205 (2d Cir.1988) ....................................18

*Burke v. Bowen*, 40 N.Y.2d 264 (1976)...................................................................23

*Carney v. Memorial Hospital and Nursing Home*, 64 N.Y.2d 770 (1985) .............23

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................. 18, 30

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)................................21

*Clift v. Syracuse*, 45 A.D.2d 596 (4th Dept.1974).......................................... 22, 28

*Coates v. City of New York*, 76 Misc.2d 769 (Sup. Ct. N.Y. County 1974)..... 22, 28

*Conzo v. City of New York*, 667 F.Supp.2d 279 (S.D.N.Y. 2009)............................7

*Finley v. Giacobbe*, 848 F.Supp.2d 1146 (S.D.N.Y 1994).............................. passim

*Flood v. Just Energy Marketing Corp.,* 904 F.3d 219 (2nd Cir. 2018)...................32

*Fuerst v. Village of Bayville*, 40 Misc.2d 909 (District Court, Nassau
   County 1963)........................................................................................................28

*Gerber v. NYC Housing Authority*, 42 N.Y.2d 162 (1971) ........................ 23, 24, 28

*Giles v. City of New York*, 41 F.Supp.2d 308 (S.D.N.Y. 1999)................................7

*Grossman v. City of New York*, 64 Misc.2d 962 (Civil Ct. N.Y. County
   1970)............................................................................................................. 23, 28

*Holtz v. Rockefeller & Co.*, 258 F.3d 62 (2nd Cir. 2001) ........................................52

*Hussy v. Town of Oyster Bay*, 24 A.D.2d 570 (2d Dept. 1965)...............................24

*In re Novartis Wage and Hour Litigation*, 611 F.3d 141 (2d Cir. 2010) ...............39

*Ind. Mich. Power Co.,* 381 F.3d at 580.....................................................................43

*Kadden v. VisuaLex, LLC*, 910 F.Supp.2d 523 (S.D.N.Y. 2012) .................... 38, 39

*Karna v. BP Corporation A.A.*, 2013 WL 1155485 (S.D.Texas 2013)............ 42, 44

*Konig v. McCoy*, 71 Mis.2d 593 (Appellate Term 2d Dept. 1971) .................. 22, 28

*Kowalski v. Dept. of Corrections*, 66 A.D.2d 814 (2d Dept. 1978) .......................24

*La Sonde v. Seabrook*, 89 A.D.3d 132 (1st Dept. 2011)..........................................26

*Lynch v. City of New York*, 291 F.Supp.3d 539 (S.D.N.Y. 2018) ............................7

*Martin v. Ind. Mich. Power Co.,* 381 F.3d 574 (6th Cir.2004)................................42

*Nabors v. Town of Somers*, 72 A.D.3d 772 (2d Dept. 2010)...................................24

*Nakahata v. N.Y. Presbyterian Healthcare System*, 723 F.3d 192
    (2d Cir. 2013) ............................................................................... 14, 28

*Piro v. Bowen*, 76 A.D.2d 392 (2d Dept. 1980) ......................................................24

*Samuelson v. Walder*, 88A.D.3d 587 (1st Dept. 2010)...........................................26

*Sanders v. NYC Transit Authority*, 130 Misc.2d 719 (Civil Court N.Y.
    County 1985) ..................................................................................................24

*Saunders v. City of New York*, 594 F.Supp.2d 346 (S.D.N.Y. 2008) .......................7

*Scott v. City of New York*, 592 F.Supp.2d 475 (S.D.N.Y. 2008) and
    2009 WL 1138719 (S.D.N.Y. 2009) ....................................................................7

*Segarra v. Federal Reserve Bank of New York*, 802 F.3d 409 (2d Cir. 2015) ........27

*Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.,* 42 F.3d 719
    (2d Cir.1994), *cert. denied,* 515 U.S. 1160 (1995) .............................................18

*Teachers Association v. Board of Education*, 34 A.D.2d 351 (2d Dept. 1970) ......22

iv

*Vaccaro v. Board of Education*, 54 Misc.2d 206 (Civil Ct. Queens County 1967) ............................................................... 23, 28

*Walsh v. New York City Housing Authority*, 828 F.3d 70 (2d Cir. 2016) ..............52

*Weyant v. Okst*, 101 F.3d 845 (2d Cir.1996) ............................................. 19, 30, 31

*Young v. Cooper Cameron Corp.*, 586 F.3d 201 (2d Cir. 2009) ............................32

## Statutes

28 U.S.C. § 1295(a)(1)....................................................................................4

29 CFR § 200(a)............................................................................................32

29 CFR Section 541.2000(a)...........................................................................31

29 CFR Section 541.400-402...........................................................................31

29 U.S.C. § 213(a)(1)....................................................................................16

29 U.S.C. § 213(a)(17)..................................................................................32

29 U.S.C. Section 207(a)(1)...........................................................................14

29 U.S.C. Section 207(o) ...............................................................................25

29 USC § 213(a)(1).......................................................................................32

Administrative Code of the City of New York, Section 12-108 ......... 12, 13, 15, 21

General Municipal Law § 92(1)........................................................................21

## Rules

Personnel Rules and Regs. of the City of N.Y., Rule XI
    Section 11.11 *et seq.* ....................................................................... 21, 27

UNITED STAES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 ------------------------------------------------------ X

JACOB SCHWARTZ,

                        Appellant,                     Docket No. 21-2445

            v.

CITY OF NEW YORK,

                        Defendant.

 ------------------------------------------------------ X

## APPELLANT'S BRIEF

## INTRODUCTION

This case is really quite simple, and begins with an astounding miscarriage of justice. The Appellant, Jacob Schwartz, worked for nearly two years for the NYC Department of Design and Construction. He did actual work beyond the agency's 35-hour work week, and banked his pay for that time worked in a "Comp Time" program. After he was fired the agency didn't pay him the money he earned for the time he was physically present and working. It was not until this lawsuit was filed and discovery commenced, that someone in authority gave a vague explanation about why he was not paid.

Before his termination, Appellant worked over 500 hours, clocking in and out each day that was involved, but was not paid. He produced reports, on a daily

basis, which were critical to decision making by higher-ups in his department. Because he waited two years to sue (having been strung along by promises that payment was coming), the City worked hard, in this case, to find technical reasons not to pay him.

In this case Appellant simply seeks to get paid for the "Comp Time" he accumulated while working for the City, *some* of which should have been paid at an Fair Labor Standards Act (FLSA) overtime rate. Although there seems to be little to no question that he was, at minimum, due the sums he had accumulated, the City has steadfastly refused to pay him anything. Unfortunately, the District Court entertained the City's objections, ignoring its obligations and the law, both on a Motion to Dismiss (dismissing all state law claims) and on a Motion for Summary Judgment, resolving factual disputes and holding, as a matter of law, that Appellant was FLSA exempt.

This lawsuit seeks unpaid Comp Time wages under the applicable New York City regulations, under a breach of contract theory, and under a *quantum meruit* theory, and payment of the FLSA overtime wages.

The State Law claims were dismissed on failure to state a claim and on Statute of Limitations grounds, with the District Court finding that unpaid wages were not available unless a lawsuit was pled as part of a petition seeking reinstatement—even though Appellant was an at-will employee with no right to

seek reinstatement. The FLSA claims were dismissed on a Motion for Summary Judgment, in which the Court found, as a matter of law, that Appellant was FLSA exempt because, as a matter of law, he worked in a decision-making capacity, even though his job involved only gathering data and reporting it to decision makers.

Lurking in the background is the reason for Appellant's discharge: he had been arrested for possession of child pornography on his home computer—not on his work computer—and the case drew publicity because the NY Post labeled him as an "aide to [Mayor] Bill de Blasio," which he was not. Mayor de Blasio even was asked about the arrest at a press conference the next day. While the City was concerned that he engaged in the unlawful behavior at work, no evidence of this was ever found. The head of Department of Design and Construction ("DDC") Human Resources testified that the money he had earned was not paid because "due to the egregious nature of the charges, moral turpitude, et cetera … we believe that he did some of that on DDC time and on a DDC instrument, [and] that he should not get the comp time" (A197). (The witness also testified that no one ever reported to her that on a particular date plaintiff had used DDC equipment for inappropriate activity (A197)).

Appellant received his punishment in the State Supreme Court. He pled guilty to one count and spent 18 months in prison. The City seeks, without any authority to do so, to punish him more by denying him nearly $20,000 in pay for

actual work that he performed. The District Court, unfortunately, went along with that scheme. This Court should not.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This appeal is from a final judgment entered on September 24, 2021 (SPA21).

The timely Notice of Appeal was filed on September 29, 2021 (A601).

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether in New York, a claim for unpaid wages not accompanied by a claim for reinstatement is subject to a four-month statute of limitations.

2.      Whether a cause of action for unpaid wages accrues from the date it is not paid, or when the employee is advised that they are not going to be paid.

3.      Whether a data processing computer-utilizing employee is exempted from payment of overtime because their reports are of great value to a government decision-making process.

## STATEMENT OF THE CASE

### A.      The Proceedings Below

The Complaint was filed on June 3, 2019 (A1). It was amended three times and the operant complaint was the Third Amended Complaint (A15-23). Defendant

moved to dismiss on September 20, 2019 (A24-26). The District Court (Torres, J.) referred the Motion to Magistrate Stewart Aaron (A27).

Magistrate Aaron issued a Report and Recommendation on January 22, 2020 (SPA1-10), recommending dismissal of all state law claims. Plaintiff sought review (A8). On June 3, 2020, Judge Torres adopted the Magistrate's Report (SPA11-18).

The case was then transferred to Judge Cronan. After discovery, Defendant moved for Summary Judgment (A54-464). After Plaintiff responded (A465-600), Judge Cronan entered an Opinion and Order (SPA19-38) on September 24, 2021. A timely Notice of Appeal followed (A601).

**B.**    <u>**Statement of Facts**</u>

From on or about May 1, 2015 until May 20, 2017, Appellant was employed by the City of New York at its Department of Design and Construction in various titles as a Provisional Employee. His initial title was Project Manager Intern (A16). His promotion to the second title, Document Control and Data Analyst, occurred on or about May 1, 2016. (See discussion of job responsibilities below.)

Appellant was an hourly employee. His hourly rate was determined by dividing his annual "salary" by 1,820 hours, which equaled a 35-hour work week. (A17)

This 35-hour work week (which involved five seven-hour days) was the work week worked by all non-executive employees and was set by policies enunciated for all non-uniformed employees by the City of New York and the Department of Design and Construction ("DDC"). (See testimony of Janice Stroughter, Deputy Commissioner of Human Resources at the DDC at all relevant times, at A169-170). It did not include weekends or holidays. This work week was created pursuant to the Career and Salary Plan developed by the Commissioner of Citywide Administrative Services, pursuant to the Personnel Rules and Regulations of the City of New York (A29-30) as authorized by the New York State Department of Civil Services, and pursuant to the DDC Employee Manual. (A347-350)

Career and Salary employees like Appellant could choose to be paid straight-time hourly wages or bank their time as "Comp Time" if they worked more than 35 hours in a week, including weekends. In Appellant's department, Comp Time was, at all relevant times, unbeknownst to Appellant, recorded as "straight-time" hours, *even if the time worked was in excess of 40 hours in a given week*. (A342-344). Appellant was advised by his supervisor that this Comp Time could continue to accrue and that there was no deadline for its use. (A17) Often it was paid out at the end of someone's employment. (A186) The City admitted, through Ms. Stroughter, that this money was money to be paid for work

already done, which was simply paid out at a later date. (A183;185) The only time DDC did not pay out this money at DDC, to the knowledge of its Human Resources head, was in this case. (A186) Deputy Commissioner Strougther testified that it was "money for work you did." (A185)

New York City has, for many years, deliberately ignored the fact that most of its Career and Salary and non-clerical/non-blue collar employees are eligible for overtime pay under the Fair Labor Standards Act since many of those in these titles do non-exempt work and are paid in hourly increments. This has occurred despite Federal Court decisions in cases such as *Scott v. City of New York*, 592 F.Supp.2d 475 (S.D.N.Y. 2008), and 2009 WL 1138719 (S.D.N.Y. 2009); *Conzo v. City of New York*, 667 F.Supp.2d 279 (S.D.N.Y. 2009); *Giles v. City of New York*, 41 F.Supp.2d 308 (S.D.N.Y. 1999); *Saunders v. City of New York*, 594 F.Supp.2d 346 (S.D.N.Y. 2008); *Lynch v. City of New York*, 291 F.Supp.3d 539 (S.D.N.Y. 2018); and many other cases and claims for overtime made by employees. (A18)

Employees in Appellant's work unit, when they worked on a holiday, could also bank that time as Comp Time. Holiday work **was** banked at 1.5 times the employee's hourly rate. (A18)

On numerous occasions during the period May 1, 2015 through May 20, 2017, Appellant worked in excess of 35 hours in a week and banked his time, doing the regular work he had been assigned, described below, work directed to the

City's Build It Back Program, either as a Project Manager Intern, or as an Computer Program Analyst. On almost all occasions, this meant he stayed at work after the normal workday. (A18)

As of May 20, 2017, according to his paycheck, Appellant had banked 457 hours and 10 minutes of Comp Time. During that period Appellant also banked 26 hours and 38 minutes of time worked on holidays. (A18)

During many of the weeks during that period, Appellant worked in excess of 40 hours in a week. Based on an analysis of Appellant's "clock-in" and "clock-out" records, these weeks included, but were not limited to, the following (A19, 564, 567-575):

| Week Ending | Total Hours |
| --- | --- |
| 6/19/2015 | 41 |
| 6/26/2015 | 46.5 |
| 7/10/2015 | 43.5 |
| 7/17/2015 | 47 |
| 7/24/2015 | 48 |
| 7/31/2015 | 47.25 |
| 8/7/2015 | 43 |
| 8/14/2015 | 46.5 |
| 8/28/2015 | 48.75 |
| 9/4/2015 | 45.75 |
| 9/18/2015 | 46.75 |
| 9/25/2015 | 47.25 |
| 10/2/2015 | 47 |
| 10/9/2015 | 45 |
| 10/16/2015 | 43.75 |
| 10/23/2015 | 45.75 |
| 10/30/2015 | 48.25 |

| | |
|---|---|
| 11/20/2015 | 43.75 |
| 12/4/2015 | 44.5 |
| 12/11/2015 | 41.5 |
| 12/18/2015 | 44.5 |
| 1/8/2016 | 43.25 |
| 1/15/2016 | 42.5 |
| 1/22/2016 | 40.5 |
| 1/29/2016 | 40.5 |
| 3/18/2016 | 40.75 |
| 4/15/2016 | 40.75 |
| 5/6/2016 | 41 |
| 5/27/2016 | 41.5 |
| 6/10/2016 | 45.25 |
| 8/12/2016 | 41.5 |
| 9/16/2016 | 49 |
| 11/4/2016 | 42.25 |

On May 20, 2017, Appellant was terminated. Since he was a Provisional Employee, he had no recourse to an appeal procedure. (A19)

Appellant received his last paycheck on June 2, 2017. Although he was paid his last week of pay, the check showed 457:10 hours of unpaid Comp Time (which included, to his understanding, some FLSA overtime), 26:38 hours of unpaid Holiday Comp (work done on holidays), and 21:16 hours of earned annual leave which had not been used. (A19-20)

Pursuant to 29 U.S.C. Section 207(o)(4), Appellant should have been paid for his FLSA overtime hours, at the time of his termination, at the rate of $37.4526 per hour, which was then his hourly rate. (A20)

Despite numerous requests, up until the date the lawsuit was filed, Appellant was not paid either straight time or overtime pay for the hours in question, or his unpaid annual leave, and he was told that it would be forthcoming. (A20; A-189-190, A565-566) Only after this lawsuit was filed did the City assert that it had determined not to pay Appellant, and at no time, even during this litigation, was any vague explanation provided. (See testimony of Janice Stroughter, A186-187.) In fact, it was the only time that the then director of Human Resources, Janice Stroughter, knew of to have ever occurred at DDC. (A191) Nor could Ms. Stroughter recall ever telling Appellant that he was not going to get paid (A190).

This non-payment caused Appellant to suffer a loss of no less than $18,913.56 in straight time hourly pay, without application of the overtime provisions of the Fair Labor Standards Act added in. The FLSA claim amounted to 144 hours, or an additional $2,696.83 in pay (an extra half-hour of pay for 144 hours, at his hourly rate at the time of termination, which was $37.4526/hour).

The City of New York benefited from Appellant's services. At all times he was working as part of the Build It Back Program, which wholly involved administration of Federal grants which allowed the City to rebuild homes which had been destroyed by Hurricane Sandy. His work allowed New York City to request payments of millions of dollars from the Federal Program through the two-

year period that he worked for DDC. That allowed the City to be reimbursed for expenses it had paid out as part of the program. (A20)

**Job Responsibilities**

As a Project Manager Intern, under general supervision of a Project Manager and Associate Project Manager, Appellant coordinated and expedited the development or improvement of simple capital engineering, architectural or landscape architectural projects. Appellant's work focus was the City's Build It Back Program, a Federally funded project to rebuild or replace homes destroyed in 2012 by Hurricane Sandy. (A16, 554-556)

As a Document Control and Data Analyst (A159), "Reporting to the Project Controls Director with latitude for independent judgment," he was "responsible for review and analysis of various data and document submissions in the Case Management System CMS)." He acted "as a primary client liaison, assisting with the development of overall functions and document management in CMS." He was also "responsible for creating various reports from CMS and reconcil[iation of] any data anomalies in CMS," and development of "various reports for the Build it Back Program." (A159, A126) In this position Appellant continued to gather data, but then placed that data into Excel, an existing program, in order to generate reports which allowed the managerial and administrative staff to assess and project the costs of individual projects or classes of projects. (A16-17) Although, when

requested, he was able to add more metrics into the daily reports he generated, he never wrote a program or designed a computer, or made operational or programmatic change in a computer or computer system. (A17) He was an analyst, meaning he analyzed data using Excel. (A122-124) His reports went to others who made the decisions (A123-124).

## C.    Appellant's Claims

Appellant, in the Third Amended Complaint, described his claims as follows:

### 1.    NYC Administrative Code Claim

Section 12-108 of the Administrative Code of the City of New York states:

> § 12-108 Overtime work by officers or employees and additional compensation therefor. Notwithstanding the provisions of any other statute, general, special or local, the mayor may authorize the head of any agency to require any officer or employee in such agency or any class or group of officers or employees in such agency to work in excess of the maximum number of hours of employment prescribed for such officer or employee or class or group of officers or employees by any statute, general, special or local, provided that each such officer or employee shall be paid overtime compensation for such work at not less than his or her regular basic pay rate. The amounts received as overtime compensation pursuant to the provisions of this section shall be regarded as salary or compensation for the purposes of any pension or retirement system of which the employee receiving such overtime compensation is a member. Such overtime compensation shall not be regarded as salary or compensation for the purpose of determining the

> right to any increase of salary or any salary increment on account of length of service or otherwise, nor shall the payment of such overtime compensation be construed to constitute a promotion.

At all relevant times the Commissioner of DDC was authorized by the Mayor to require employees to work in excess of the maximum number of hours (35) prescribed for DDC employees.

At all times Appellant's work was authorized by and required by the Commissioner of DDC or his subordinates to whom he had delegated such responsibility.

By failing to pay Appellant for time worked, and by its failure to pay Appellant overtime for time worked in excess of 40 hours in a given week, Defendant violated § 12-108 of the Administrative Code of the City of New York.

### 2. Breach of Oral Contract

Appellant, at all times he worked in excess of 35 hours, was promised by his supervisors that he would, subsequent to the date of his next paycheck, be able to "cash in" his accrued Comp Time for wages, and that there was no time limit on when he could cash in such time.

Those supervisors were at all times authorized agents of the City, DDC, and the Commissioner of DDC.

Appellant relied on those representations, leading him to accrue time rather than choosing to be paid for his extra time on a bi-weekly basis.

By failing to pay Appellant for his Comp Time, DDC has breached said oral contract, which Appellant relied on to his detriment (*see Nakahata v. N.Y. Presbyterian Healthcare System*, 723 F.3d 192, 203 (2d Cir. 2013).

### 3. *Quantum Meruit* Claim

The City received value from Appellant's work recorded in its records as "Comp Time."

That value was equal to, at minimum, the straight-time hourly rate Appellant expected to be paid as Comp Time.

By not paying Appellant despite its acceptance of the value created by his work, the City is indebted to Appellant in *quantum meruit*, lest it be the recipient of unjust enrichment.

### 4. FLSA Claim

By failing to pay Appellant overtime pay for time he worked in excess of 40 hours in the weeks set forth above, upon the termination of his employment, Defendant violated 29 U.S.C. § 207(a)(1) and 29 U.S.C. § 207(o)(4).

The City, by not paying Appellant in accordance with the FLSA, acted intentionally, or in reckless disregard of Appellant's rights, entitling Appellant to liquidated damages.

### D. Claim for Damages

The Third Amended Complaint makes the following claim for damages:

– By the failure of Defendant to pay Appellant as above-described, Appellant lost wages of no less than 483.75 hours, which at his hourly rate of $37.4526 means that he was not paid, at minimum, $18,117.69. To the extent that any of those hours were in excess of 40 hours in a given week, which Appellant estimates as 144 hours, Appellant has also been deprived of overtime pay.

– By failing to pay Appellant for his earned annual leave, a benefit which is part of Appellant's wages, Appellant was deprived of $795.57 in pay.

## E.    The Decisions Appealed From

The District Court referred the Motion to Dismiss to Magistrate Stewart Aaron, who issued a Report and Recommendation on January 22, 2020 (SPA1-10). Magistrate Aaron did not dismiss the FLSA claims (SPA4-6) but did dismiss all of the pendent claims.

With respect to the NYC Administrative Code, under Section 12-108, Magistrate Aaron held, even though Plaintiff alleged that work in excess of 35 hours, as extra pay, as authorized by § 12-108 and implemented at DDC pursuant to that regulation, that no "statute, general special or local establish[es] 35 hours per week as the maximum number of hours of employment."

With respect to the breach of contract and *quantum meruit*, Magistrate Aaron held that "a contract or quasi-contract claim for lost wages by a public employee must be brought in an Article 78 proceeding" (citing *Finley v. Giacobbe*,

848 F.Supp.1146, 1150 (S.D.N.Y. 1994), aff'd 79 F.3d 1285 (2d. Cir. 1996)), seeking reinstatement. The Magistrate then held that the statute of limitations (four months) began to run upon receipt of the last paycheck, and did not address the question of notice. He applied this holding to the *quantum meruit* claim as well.

The District Court, after objection, affirmed the Magistrate's report (SPA11-18). She too held that no City or State statute required payment for work done in excess of 35 hours, and that the DDC Employee Manual had no legal weight. With respect to the common law claims, also relying on *Finley*, *supra*, even though the Court noted that a claim where damages is the principal form of relief need not be brought as an Article 78 claim, it sustained the Magistrate's holding that an Article 78 proceeding for reinstatement was a prerequisite to a claim for unpaid wages earned prior to termination. The Court sidestepped the accrual date of the wage claim by holding that all wage claims had to be coupled with a reinstatement proceeding, and that that cause of action accrued on the date of discharge. (SPA17)

The FLSA claim was dismissed on a Summary Judgment Motion, in an Opinion and Order issued on September 24, 2021 by Judge John P. Cronen (SPA19-38), to whom the case had been transferred. Judge Cronen ruled that as a matter of law, there was no issue of fact that Appellant was barred by the FLSA's administrative exemption under 29 U.S.C. § 213(a)(1), because Appellant's primary duty included the exercise of discretion and independent judgment with

respect to matters of significance. (SPA38) In a series of footnotes (SPA 23-25) the judge discounted all of the issues of fact raised by Appellant, finding them without support or in conflict with other parts of the record, including a deposition transcript submitted without the errata page (A557).

The District Court did not address the other grounds argued by the Appellee, including the "computer exception."

## STANDARD OF REVIEW

**A. On the Motion to Dismiss**. Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 662, 678 (quoting *Twombly*, 550 U.S. at 555). The

critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**B**. **On Summary Judgment.** This Court reviews a district court's grant of summary judgment *de novo. Finley v. Giacobbe*, 79 F.3d 1285, 1290–91 (2nd Cir 1996); *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.,* 42 F.3d 719, 722 (2d Cir.1994), *cert. denied,* 515 U.S. 1160 (1995). On appeal "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The non-movant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper. *See Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988).

The Court must not weigh the evidence, but instead is "required to view the evidence in the light most favorable to the party opposing summary judgment, to

draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted); *Aulicino v. New York Dept. of Homeless Services*, 580 F.3d 73, 83 (2d Cir. 2009) (summary judgment reversed because evidence not viewed in light most favorable to party opposing motion).

## SUMMARY OF THE ARGUMENT

The Appellant asserts in the argument below:

A.     On the dismissed claims:

1.     That the holding below that an unpaid wage claim against a government entity *must* be coupled with a proceeding for reinstatement, even where no right to reinstatement exists, runs contrary to New York law and the United States Constitution.

2.     That the Statute of limitations on a state law unpaid wage claim, even if it must be brought under Article 78 of the CPLR, does not accrue until that the employee is told that he will not be paid.

B.     On the grant of summary judgment: That the District Court inappropriately found "no issues of material fact," on key issues, including the nature of Appellant's job, because they inappropriately discounted much of what Appellant submitted, and inappropriately decided key issues of fact contested by

Appellant's submissions which showed that Appellant was a data analyst whose reports, while important, had no decision-making authority.

## ARGUMENT

## POINT I

## THE MOTION TO DISMISS
## WAS IMPROPERLY GRANTED.

### New York City Administrative Code Claim

Magistrate Aaron recommended dismissal of this claim holding that Appellant did not point to any statute, general, special or local, establishing 35 hours each week as the "maximum number of hours of employment." Judge Torres agreed. In making this finding, Magistrate Aaron wholly ignored paragraph 7 of the Third Amended Complaint, which states:

> "7. This 35-hour work week (which involved five seven-hour days) was the work week worked by all non-executive employees and was set by policies enunciated for all non-uniformed employees by the City of New York and the Department of Design and Construction ("DDC"), as per this paragraph and paragraphs 18, 19, and 20, *infra*. It did not include weekends or holidays. This work week was created pursuant to the Career and Salary Plan developed by the Commissioner of Citywide Administrative Services, pursuant to the Personnel Rules and Regulations of the City of New York as authorized by the New York State Department of Civil Services, and pursuant to the DDC Employee Manual."

The Personnel Rules and Regulations of the City of New York (relevant section attached as A29-30) at Rule XI Section 11.11.1 refers to a Career and Salary Plan, and the following sections talk about how the Commissioner of Citywide Administrative Services administers the Plan.

The Career and Salary Plan exists. It is listed on the DCAS website as PSB No. 310 (A32) but cannot be found online. That Plan is a New York City Regulation.

But there is the Department of Design and Construction Employee Manual (A317-451) (which was incorporated into the Complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), which is wholly reproduced in the record (A317-451) The Manual, which is a regulatory in nature, not only sets forth the 35-hour work week, it has a provision for compensatory time (A342-344); and it provides for Terminal Leave, which includes "unused annual leave and compensatory time" (A361-362).

These provisions, enacted by DDC, are authorized by Section 12-108 of the NYC Administrative Code, which, in turn, was authorized by § 92(1) of the General Municipal Law.

The Magistrate's and the District Court's finding that no statute, general, special or local, was relied on by Appellant to establish a 35-hour work week, is contrary to the law discussed in the Complaint, and contrary to the regulations

governing the employment of all NYC government employees (to the extent they do not conflict with a collective bargaining agreement). The Magistrate and the District Court, in essence, is stating that City employees can be denied pay for time they actually worked without violating a law or regulation. This is absurd.

## Common Law Claims

The Magistrate and Judge Torres then held that Appellant's Common Law claims are barred because they could only be brought as part of or subsequent to an Article 78 proceeding. (SPA 16). This holding is wholly contrary to New York law (which governs), which has not been discounted, as Judge Torres held, by the Second Circuit.

The New York Courts have taken a strong stand against employees not receiving pay that they have earned. *See Teachers Association v. Board of Education*, 34 A.D.2d 351 (2d Dept. 1970) (failure to pay value of unused sick leave upon an employee's death); *Clift v. Syracuse*, 45 A.D.2d 596 (4th Dept.1974) (failure to compensate for unused vacation time; money award on unjust enrichment and due process grounds); *Konig v. McCoy*, 71 Mis.2d 593 (Appellate Term 2d Dept. 1971) (vacation and compensatory time; awarded on *quantum meruit* grounds); *Coates v. City of New York*, 76 Misc.2d 769 (Sup. Ct. Queens County 1974) (unused vacation and compensatory time; granted on breach of contract grounds); *Grossman v. City of New York*, 64 Misc.2d 962 (Civil Ct. N.Y.

County 1970) (unpaid overtime; "the City, as an employer, should be in no more favored position than a private employer in its dealings with its employees. Certainly a private employer should not be permitted to deprive an employee of that which he has earned, and the City should be held at least to the same standard, if not a higher one"); *Vaccaro v. Board of Education*, 54 Misc.2d 206 (Civil Ct. Queens County 1967) (payment of unused accrued vacation pay at the end of an employee's tenure).

Appellant had no Article 78 (an action *in mandamus*) to bring since he was not seeking reinstatement or challenging his discharge. Besides the cases above, none of which are Article 78 proceedings, the courts in New York have expressly said that an *action at law* is permitted.

In 1977, in an oft-quoted decision in *Gerber v. NYC Housing Authority*, 42 N.Y.2d 162, 164 (1971), the New York Court of Appeals addressed this issue in a case involving an employee suspended from employment beyond the statutory limitation of 30 days. Said the Court: "The claim for accrued salary *may be made by way of an action at law, and it is not necessary to commence an Article 78 proceeding*" (emphasis added). *See also Burke v. Bowen*, 40 N.Y.2d 264, 267 (1976)(no right to reinstatement; wages due because of a premature termination of employment); *Carney v. Memorial Hospital and Nursing Home*, 64 N.Y.2d 770, 772 (1985)(pay during period of suspension; no prior Article 78); *Piro v. Bowen*,

76 A.D.2d 392, 396-397 (2d Dept. 1980)(suit for back salary, no right to reinstatement; "There are situations where a public employee can recover back salary in an action at law though he has not established by way of an Article 78 proceeding his right to reinstatement to the position from which he was terminated"); *Kowalski v. Dept. of Corrections*, 66 A.D.2d 814, 815 (2d Dept. 1978)("Appellant's claim, which is for unpaid salary … is properly made by way of an action at law"); *Hussy v. Town of Oyster Bay*, 24 A.D.2d 570 (2d Dept. 1965)("We disagree … with the denial of the motion on the additional ground that plaintiff is required to bring a proceeding under article 78 of the CPLR to determine his right to the position as a condition precedent to his obtaining back salary")(cited by the Court of Appeals, with approval, in *Gerber*); *Sanders v. NYC Transit Authority*, 130 Misc.2d 719, 720 (Civil Court N.Y. County 1985)("[plaintiff] can sue for the determinable amount of such pay prior to determination of the charges of misconduct"). And *see Nabors v. Town of Somers*, 72 A.D.3d 772, 769 (2d Dept. 2010).

Finley v. Giacobbe, 848 F.Supp.2d 1146, 1150 (S.D.N.Y 1994), relied on by Magistrate Aaron and Judge Torres, is not inapposite. There, the District Court, in reliance on *Gerber*, held that suspended employees who have returned to work may seek wages unlawfully withheld in an action at law. The *Finley* case, which was clarified by the Second Circuit at 79 F.3d 1285 (2d Cir. 1996), involved a

probationary employee suing about her reinstatement, and did not involve an independent claim for unpaid wages; her right was wholly dependent on her right to reinstatement. But Magistrate Aaron, as affirmed by Judge Torres read the District Court decision as a statement of law in New York, and held that under New York law, a terminated employee, even one not challenging his termination, must utilize Article 78 to recover the same pay. Such a rule, which the New York Courts have not adopted, would be entirely inequitable.

Finally, there is the question of when the causes of action for *quantum meruit* and breach of contract accrued, if an Article 78 is required. Paragraphs 1 and 14 of the Third Amended Complaint allege:

> "1. This is a Fair Labor Standards Act ("FLSA") and wage non-payment case filed by a former employee of the City of New York (the "City"). During many weeks, Appellant performed the services of his job after his seven-hour workday for which he was not paid, electing instead to "bank" those hours as "Comp Time," a practice which allowed him to be paid or use that time as leave time, at a later date. During approximately 33 weeks of his two-year career, he worked more than 40 hours per week. That time should have been included in his Comp Time, a practice which was allowed by 29 U.S.C. Section 207(o). When Plaintiff was terminated, despite requests, and promises to resolve the situation, he was not paid for the Comp Time at all. This lawsuit seeks payment of those wages under the FLSA, under New York City regulations, under a breach of contract theory, and under a *quantum meruit* theory."

"14. Despite numerous requests, Plaintiff has not been paid either straight time or overtime pay for the hours in question, *or* his unpaid annual leave, to his injury in a sum of no less than $18,913.56, not including the application of the overtime provisions of the Fair Labor Standards Act to the period of his employment."

Under Article 78 of the CPLR, a cause of action accrues not upon the mere occurrence of an event which may require a remedy, especially when the agency itself has created an ambiguity about what the agency has decided, or has not made a final decision. *Biondo v. NYS Board of Parole*, 60 N.Y.2d 882, 834 (1983); *La Sonde v. Seabrook*, 89 A.D.3d 132 (1st Dept. 2011); *Samuelson v. Walder*, 88A.D.3d 587 (1st Dept. 2010). Appellant alleges that he kept being promised that the nonpayment would be resolved. In fact, the Deputy CP, Janice Slaughter, admitted in her deposition that she told him that he would be paid (A189-190) and established that Appellant was *never* notified of a final decision. (A190, lines 8-12)

The pleading did not establish a date which could be utilized in the context of a Motion to Dismiss, because there was none. In Paragraph 14 it stated: Despite numerous requests, Plaintiff has not been paid either straight time or overtime pay for the hours in question." A20. There is not statement in the complaint about a denial, or about having been informed of a denial, because no reason was even suggested until Ms. Strougther's deposition in this case.

Given the law and the District Court's failure to take into account the allegations set forth in the Third Amended Complaint, allegations which must be deemed true and which must be viewed in such a way that *all* reasonable inferences are drawn in the Plaintiff's favor, *Segarra v. Federal Reserve Bank of New York*, 802 F.3d 409, 411 (2d Cir. 2015), the Report should not have been adopted and the District Court should have denied the Motion to Dismiss in its entirety. This Court should do the same.

The Magistrate's Recommend Decision wholly missed the mark. First, he held that the Third Amended Complaint failed to identify "*any* statute, general, special or local establishing a 35 hour work week." (SPA 7-8). So did the District Court (SPA 13-15). Both clearly missed Paragraph 7 of the Third Amended Complaint. The Magistrate did not hold that the Career and Salary Plan was not authorized by a statute; if he had, he would have been wrong since it was authorized by the Personnel Rules and Regulations of the City of New York at Rule VI, Sections 11.1.1, 11.2.1, and 11.3.1 (A29-30). The Personnel Rules govern the employment rights of 350,000 New York City employees and are authorized by the New York Civil Service Law.

Then there is the "requirement that an unpaid wage claim be brought pursuant to Article 78 of the CPLR," whether brought as a statutory claim, a breach of contract claim, or a *quantum meruit* claim (claims suggested by this

Court in *Nakahata v. N.Y. Presbyterian Healthcare System*, 723 F.3d 192, 203 (2d Cir. 2013)). The District Court clearly misunderstood *Gerber v. NYC Housing Authority*, 42 N.Y.2d 162, 165 (1977), and its numerous progeny, cited above. And *see Clift v. City of Syracuse*, 45 A.D.2d 596 (4th Dept. 1974)(unpaid vacation time, not brought as an Article 78); *Konig v. McCoy*, 71 Misc.2d 593 (Appellate Term, 2d Dept. 1971) (unused vacation and compensatory time owed to estate of deceased employee; not brought by Article 78); *Coates v. City of New York*, 76 Misc.2d 769 (Sup. Ct. N.Y. County 1974)(unpaid vacation and comp time; not brought as an Article 78); *Vaccaro v. Board of Education*, 54 Misc.2d 206 (Civil Court Queens County)(unpaid vacation time; not brought under Article 78 since employee was a provisional); *Grossman v. City of New York*, 64 Misc.2d 962 (Civil Court N.Y. County)(unpaid annual leave claim made by employee who left City dm; not an Article 78 proceeding); *Fuerst v. Village of Bayville*, 40 Misc.2d 909 (District Court, Nassau County 1963) (vacation pay unpaid at the end of employment).

The case law demonstrates that the principle enunciated in *Gerber* was clear: A claim for pay, standing alone and independent from a request for injunctive (Article 78) relief, can be brought in an action at law. *Finley v. Giacobbe*, 79 F.3d 1285 (2d Cir. 1996), does not hold that *Gerber* is inapplicable in cases like the case at bar. Its holding is quite the opposite.

*Finley* does not support what the District Court held, or what the City now argues. In the *Finley* case the plaintiff's claim "depend[ed] on a right to reinstatement, an issue that … must first be addressed in an article 78 proceeding." 79 F.3d at 1293. The *Finley* court distinguished *Gerber* and its progeny because "reinstatement is … not an issue in back pay claims for wrongful suspension." *Id.* The Court explained that a claim for money, where an "ouster" cannot be contested, is a contract action. The case before this Court is not a case where Appellant had any right to contest his discharge; he was a provisional employee subject to termination at any time. He did not sue for back pay; he sued for money earned but not paid, a claim which can be asserted as a matter of law and not in a *mandamus* action.

There is no question here that Appellant alleges that he was required to perform hundreds of hours of work, was authorized to work, and did work, and that he was not paid for that work. When looked at through the lenses of the Thirteenth Amendment or Fourteenth Amendment, much less applicable New York law, it should be elementary that commencement of a reinstatement proceeding under Article 78 in order to receive wages already earned was unnecessary.

**THE GRANT OF SUMMARY JUDGMENT
WAS DECIDED IMPROPERLY**

**A.    An Employer's Burden**

Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corpage v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation and footnote omitted).

The Court, however, must not weigh the evidence, but instead is "required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996) (citations omitted); *Aulicino v. New York Dept. of Homeless Services*, 580 F.3d 73, 83 (2d Cir. 2009) (summary judgment reversed because evidence not viewed in light most favorable to party opposing motion).

Here we have a situation where the Appellee attempts to prove that there is no issue of fact relevant to its assertion that Appellant fit under the Administrative Exemption to the FLSA and to the Computer Employee Exemption[1] to the FLSA only by misciting the record and mischaracterizing the record. There is no way that an examination of the record as required by *Weyant* and *Aulicino* could lead this Court to find that Appellant, as a matter of law, was an employee "whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance (29 CFR Section 541.2000(a)) or was a computer *systems* analyst who determines hardware, software or system functional specifications, who designed or created computer systems or programs, or who designed or created computer programs related to machine operating systems." (29 CFR Section 541.400-402). Perhaps most significantly, the Court below **did not make one cite** to the testimony Appellant's direct supervisor, Mohammed Haque, or to the Project Executive, Michael Kenney, the administrator who hired Appellant for the job and who worked directly with him on a daily basis. In fact, Appellant had to introduce their testimony (A456-553) into the record. This Court must question from the beginning how an employer can argue that an employee fits into an exempt category as a matter of law but feels that his direct supervisors, though

---

[1] We argue this point should this Court determine to reverse on the Administrative exemption issue, but consider the Computer Employee Exemption since the entire record on the Motion for Summary Judgment is before the Court, and the Court can consider the entire motion *de novo*.

deposed, could not offer one supportive or relevant piece of testimony supporting this assertion.

Furthermore, this standard of review must be applied recognizing that it is the employer that bears the burden to establish the applicability of an exemption under the FLSA. *See Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009). *Flood v. Just Energy Marketing Corp.,* 904 F.3d 219, 227 (2nd Cir. 2018).

**B.** **Issues of Fact Should Have Foreclosed the Entry of Summary Judgment on the FLSA Exemption Issues.**

The Court below entered summary judgment, finding, as a matter of law, that the exemption set forth in Section 13(a)(1) of the FLSA, 29 USC § 213(a)(1), which requires that an administrative employee has a job "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance" (see 29 CFR § 200(a)) applies. Appellee also argued that Appellant fell under the "computer employee" exemption, see 29 USC § 213(a)(17), which allows an exemption where an employee is a "computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is:

(A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

(B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

(D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills."

**1.     The Independent Judgment/Matters of Significance Exemption Clearly Is a Fact Issue.**

Appellant was one of the first five non-managerial people hired for the BIB project. He was hired as a Project Manager Intern. See Plaintiff's Dep. at 17:22-25 (A116); Jacob Schwartz Declaration at Paragraph 6 (A561-562). He received maps to find the location of fire hydrants, verified contractor information, and vetted information for homes listed in HRO Work Orders. See Haque Dep. (A466-501) at page 12 line 20 – page 13 line 9 (A477-478); page 14 line 7 – page 15 line 25 (A479-480); Ex. B, Kenny Dep. (A502-553) at pages 14, 18 and 27 (A515, 519, 528).

Appellant worked with a 10-person team consisting of one other Project Manager Intern, three Design Project Managers, a Data Director, an Assistant Reporting Director, Assistant Commissioner, Deputy Project Executive, and

Project Executive. He was the lowest ranked person on the team. Plaintiff's Dep. at 34:1-15 (A121); Jacob Schwartz Declaration at Paragraph 6 (A561-562).

Appellant applied for and in May 2016 was granted a promotion to the civil service title Computer Programming Analyst, Level II. In connection with this promotion, Appellant's salary increased to $66,360.00. In that title he "had latitude for independent judgment" or "latitude, not "wide latitude." (A159;161); Jacob Schwartz Declaration at Paragraph 7 (A562).

Appellant did not "manage" the vetting, he performed the vetting.

Mohammed Haque, Appellant's immediate supervisor, in his deposition repeatedly made it clear that Appellant's job involved "collecting information and creating reports" (see, *e.g.,* Haque Deposition at page 12 line 20 – page 13 line 9 (A477-478), a job he did the "whole time" he was at DDC. Haque Dep. Page 13 lines 10-13 (A478). Haque discussed how Appellant would "collect information" from others in the field or in the office and record the information and create reports. Haque Dep. Page 14 line 7 – page 15 line 25 (A479-480). Appellant's job involved getting "various pieces of data and putting it into one big report." Haque Dep. Page 23 lines 21-23 (A488). The IT person helped make that more efficient. Haque Dep. Page 24 lines 8-10 (A489). Appellant attended meetings in order to present reports or discuss the data collection process. Haque Dep. Page 25 lines 6-8 (A490). Appellant spent most of his day sitting at a desk. Haque Dep. Page 25

lines 23-23 (A490). Haque at no time described Appellant having any decision making authority. He described someone gathering, inputting, and presenting data.

Christine Flaherty, who was the Assistant Commissioner to whom Haque reported, testified similarly: Appellant "gathered information and synthesized the information into reports that could be understood," "reconciled information that ensured that it was accurate," and issued a daily report. Flaherty Dep. page 13 line 7 – page 14 line14, A80-81.

Michael Kenny, the Project Executive, testified similarly in his deposition. He testified that Appellant when hired was "tasked with building out the data base and tracking new homes." Kenny Dep. Page 10, lines 1-2 (A511). When asked what Appellant tracked, he testified "It would be locations, it would be visits; it would be the pathway that they were put into after we surveyed the homes; the CM that was assigned to the home, and then the contractor who was assigned and then if they flipped pathways he would track that, and then the schedule of construction, and the DOB permits, the sign offs. Multiple aspects of the project." Kenny Dep. page 10, lines 3-11, A511. Appellant would access reports that others wrote and then include the information in a daily report. Kenny Dep. page 13, lines 15-20, A514. Appellant's job was to "coordinate all of that information into a database for a daily meeting." Kenny Dep. page 18, lines 6-8, A519 Appellant would be corresponding daily with the field and he would be tracking data, keeping all the

data on multiple spreadsheets and raise concerns. Kenny Dep. page 23, lines 10-14, A524. Appellant's data was printed out every morning on spreadsheets and used as the basis for Regional Managers and the Project Executive to check with Construction Managers. Kenny Dep. page 30 line 20 – page 32 line 18, A531-533.

Appellant did not create budgets. Appellant testified that "we were given a project description that estimated the amount of money it would cost to do an average elevation, an average reconstruction, an average rehabilitation. … I had to project how much money it would cost to do all the projects based off of those individual estimations." He did not testify that he would create cost projections. Appellant had no power to determine budgeting. He would use new information to adjust projections. Pl. Dep. at 55:22- 56:2, A126.

The testimony was not that Appellant worked with over 100 contractors simultaneously. His job was to "check that they submitted the proper paperwork." Pl. Dep. at 35:3-4, A121. The Appellee, below, repeatedly asserts that Appellant was involved with managing contractors, citing his deposition at page 35 lines 1-18 (which does not say that) (A121), and the District Court credited that assertion. But on page 34, lines 24-25 (A121) Appellant expressly stated that he "did not manage them." The work he did was to vet their credentials. Pl. Dep. at page 35 li. 20-25, A121. The only place where the word "managed" is used is on Appellant's resume, is where he says that he "managed the vetting process" (A156-157), but the

District Court found the resume binding, despite the sworn testimony. Even though that would be a minor role, since he was the only one doing the vetting, the resume was meant to glorify his role doing vetting. Jacob Schwartz Declaration at Paragraph 2 (A559-560). Appellant testified that he would go through projects and make sure they "fit the parameters of what they were supposed to give us … make sure that we had the proper paperwork in the case management system." Pl. Dep. at 5:19-25 (A113); 36:1-23 (A121).

Appellant testified that his work involved designing several Excel workbooks that automatically calculated various metrics based off of dropping in different reports that one could pull out of the case management system. In fact, he testified, on pages 42-43 of his deposition (A123), that initial reports were done "by hand," and that he began to use a "very simple Excel spreadsheet." He then stated that "we" added more "metrics" which made it more complicated. At no time did he use the word "I." He testified that "we," the team that he was part of, made it more complicated. To describe what was developed a "sophisticated tracking system" to replace older "crude Excel spreadsheets" is extremely misleading. No witness used the words "sophisticated data tracking system." In his testimony it is referred to it as a "data tracking system." Pl. Dep. 44:2-3, A123. Second, both the "crude" and "sophisticated" systems used Excel workbooks to perform their functions. The former was basic Excel, the latter was very advanced

Excel, but both were Excel. In the last several months of his employment DDC IT moved his workbooks into SQL, since Excel was slower. Appellant did not do that work, however. He made it explicit in his testimony that it was all Excel. Pl. Dep. 41:2-25, 42:1-7 (A122-123). Also note: The more "sophisticated" Excel methods he used later on were all learned either from his supervisor or through Googling things while at work. None of it was based on prior knowledge. And all actual report automation outside of Excel was programmed by IT employees at DDC who helped Appellant's group from outside the BIB unit. Paragraph 3 Jacob Schwartz Declaration (A560). Appellant had to "write up short statements and PowerPoint presentations for the Assistant Commissioner." Pl. Dep. 39:19-22, A122. Appellant was "a" lead representative, not "the" lead representative. And see Jacob Schwartz Declaration at Paragraph 4 (A561). Appellant testified that DDC "needed a means to report dozens if not hundreds of metrics in a very quick fashion that the Commissioner was requesting." Pl. Dep. at 44:2-4, A123.

Below, Appellee relied on only one case in support of its assertion here, *Kadden v. VisuaLex, LLC*, 910 F.Supp.2d 523, 535–36 (S.D.N.Y. 2012), which was, in fact, inapposite. In that case Judge Scheindlin, *after trial*, found that an employee who was comparable to Appellant did not fall into either the administrative employee or the computer employee exemption. In evaluating these

exemptions, Judge Scheindlin stated, first, with respect to the administrative exemption:

> "The second requirement—that the employee exercise 'discretion and independent judgment'—generally involves 'the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered.' 'The term 'matters of significance' refers to the level of importance or consequence of the work performed.' 'The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources…'"
>
> " '[D]iscretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." "The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.

*Kadden v. VisuaLex, LLC*, 910 F.Supp.2d 523, 535–36 (S.D.N.Y. 2012). The Court then found against the defendants, relying on the Second Circuit's decision in *In re Novartis Wage and Hour Litigation*, 611 F.3d 141, 156 (2d Cir. 2010), where the Court of Appeal found against an employer where there was

> "no evidence in the record that the [employees] have any authority to formulate, affect, interpret, or implement [employer's] management policies or its operating practices, or that they are involved in planning [employer's] long-term or short-term business objectives, or that they carry out major assignments in conducting the operations of [the

employer's] business, or that they have any authority to commit [the employer] in matters that have significant financial impact."

## 2.  The Computer Employee Exemption

Appellant testified that he *worked* with computer programs (as does every person who works on a computer, be it in Word, or Adobe Acrobat, Excel, Outlook or Powerpoint). Nowhere in Appellant's deposition (see, *e.g.*, page 52, lines 20-25 (A125) and page 53, 1-6 (A125)), does he say a word about computer programs other than Excel and SQL, much less doing programming. The testimony cited below by Appellee was that of the Appellant saying that the job description counsel showed him reflected his computer analyst position "broadly speaking." On pages 40-41 of Appellant's deposition (A122) he spoke about building a "sophisticated data tracking system" but he never testified that he wrote a program. He simply worked with Excel. He testified that he designed "several Excel workbooks that automatically calculated various metrics based off on dropping in different reports that he could pull out of the management system." See Appellant's Deposition at page 41, lines 2-10, A122. An Excel workbook is a series of Excel spreadsheets grouped together in a single file. Excel is a program; Appellant had to figure out how to enter data into the program and produce reports for the decision makers above his level. Counsel for Appellant described it as a "data tracking system." See Plaintiff's deposition at page 41, lines 17-18, A122.

Appellant told her that it was a "series of different reports…design progress reports, construction progress reports…five or six different reports." page 41, lines 21-25, A122. He actually described it as a "very simple Excel spreadsheet," page 42, lines 23-24 (A123), not a "sophisticated computer system." Appellant did not come up with this idea on his own. On pages 42 line 20 through page 43 line 3 of his deposition (A123) Appellant used the word "we" ("we" realized, "we" developed, "we" needed, "we" made it more complicated, "we" needed to add more metrics). And see Paragraph 7 of the Jacob Schwartz Declaration (A562).

Mohammed Haque testified that Appellant did not create any programs; they were purchased. Haque Deposition page 16 lines 11-25, A481. An IT person was part of the team, facilitating data access and data configuration. The IT person would be given standard specs about a report and he would help create the report. Haque Deposition at page 17 line 13 – page 21 line 20 (A482-486). The IT person was instructed to set up the database program to create a certain report. Haque Dep. page 22 line 21 – page 23 line 6 (A487-488). Haque at no time described Appellant as doing "design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications." He described someone gathering, inputting, and presenting data.

Finally, with respect to what the District Court relied on essentially as an "admission," involving a question about the Civil Service job description for Appellant's title (A161-162), Appellant disputed that he did "complex work in the development of computer programs." He testified that that description reflected his job duties "broadly speaking." Pl. Dep. at 53:2 and 53:8-21, A125.

Law with respect to the computer exemption is spare, but the case law indicates that not all employees who work with computers are to be exempted under the FMLA. In *Karna v. BP Corporation A.A.*, 2013 WL 1155485 *14 (S.D. Texas 2013), on a summary judgment motion the District Court held:

> The regulations make clear that not all employees who work with computers are to be exempted under the FLSA. Such a reading of the exemption would be "an understandable mistake, one that arises from the common perception that all jobs involving computers are necessarily highly complex and require exceptional expertise." *Martin v. Ind. Mich. Power Co.,* 381 F.3d 574, 580 (6th Cir.2004). Instead, "the regulations provide that an employee's primary duty must require 'theoretical and practical application of highly-specialized knowledge *in computer systems analysis, programming, and software engineering'* not merely 'highly-specialized knowledge *of computers and software.'"* Id. (emphasis in original).

*Karna v. BP Corpage North America, Inc.*, 2013 WL 1155485, at *14 (S.D. Tex. 2013). That Court's analysis of the facts in that case are particularly relevant here:

**"i. The application of systems analysis techniques and procedures, including consulting**

**with users, to determine hardware, software or system functional specifications**

Merely doing some work related to the development of WR5 is not sufficient to make Karna an exempt employee. Systems analysis involves making "actual, analytical decisions about how [the defendant's] computer network *should* function." *Chicca,* 858 F.Supp.2d at 786 (citing *Ind. Mich. Power Co.,* 381 F.3d at 580) (emphasis added). Here, although parties do not appear to dispute that Karna consulted with users, there is conflicting evidence on whether Karna had any say as to what WR5 would actually look like, or whether he functioned merely as a liaison between two groups that retained all decision-making authority… Accordingly, the Court cannot say, on the evidence presented, whether Karna's primary duty involved the use of systems analysis techniques to determine what hardware, software or system functional specifications BP would employ. *See Ind. Mich. Power Co.,* 381 F.3d at 580–81 (declining to find employee was exempt as a computer professional where he consulted with users for the purposes of repair, not for the purposes of determining what hardware, software or system functional specifications the defendant would employ).

**ii. The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications**

Similarly, the Court cannot say whether Karna's duties as a liaison between third party developers and business users involved design, development, documentation, analysis, creation, testing or modification of computer systems or programs, based on and related to user or system design specifications. … However, the scope of the exemption also reaches

to documentation, analysis and modification of computer systems. Factual questions exist as to the extent Karna worked with business users and third party developers on enhancements and necessary changes to WR5. If Karna did, in fact, have some say in the modifications, and if collaborating with developers and users to determine the necessary modifications was a significant portion of what Karna did as a liaison between end-users and developers, he would be an exempt computer professional. ... Although neither party has explained the process by which Karna performed his facilitation duties, it is hard to imagine that he did not engage in some analysis and documentation of WR5 as part of his responsibilities… The extent of any analysis and documentation of WR5 that Karna performed may also allow a jury to conclude that Karna was an exempt computer professional. Finally, while Karna has produced some evidence that the amount of time he spent conducting testing was minimal and BP does not appear to dispute this characterization … a jury may find significant the end-user testing Karna conducted when viewed *in combination* with other evidence that BP may produce at trial regarding Karna's analysis, documentation or modification of WR5.

*Karna v. BP Corpage North America, Inc.*, 2013 WL 1155485, at *16–17 (S.D.Tex. 2013)

### 3.  <u>Questions of Fact Abound on Both Issues.</u>

As we said above, among the key deficiencies with the Decision below is its failure to cite once to the deposition testimony of Appellant's immediate supervisor, Mohammed Haque, or to cite relevant portions of the testimony of Mr. Haque's boss, Christine Flaherty. The Court, as we discuss below, in several

poignant footnotes (SPA 23 and 24) simply brushed aside references in Appellant's 56.1 statement as "unsupported," or "manufactured."

Mr. Haque, in his deposition, repeatedly made it clear that Appellant's job involved "collecting information and creating reports" (see, *e.g.,* page 12 line 20 – page 13 line 9 (A478-479)), a job he did the "whole time" he was at DDC. Haque Dep. page 13 lines 10-13, A479. Haque discussed how Appellant would "collect information" from others in the field or in the office and record the information and create reports. Haque Dep. pages 14 line 7 – 15 line 25 (A479-480). Appellant did not create any programs; they were purchased. Haque Dep. page 16 lines 11-25, A481. An IT person was part of the team, facilitating data access and data configuration. The IT person would be given standard specs about a report and he would help create the report. Haque Dep. pages 17 line 13 –21 line 20 (A482-483). The IT person was instructed to set up the database program to create a certain report. Haque Dep. pages 22 line 21 –23 line 6 (A487-488). Appellant's job involved getting "various pieces of data and putting it into one big report." Haque Dep. page 23 lines 21-23 (A488). The IT person helped make that more efficient. Haque Dep. page 24 lines 8-10, A 489. Appellant attended meetings in order to present reports or discuss the data collection process. Haque Dep. page 25 lines 6-8, A490. Appellant spent most of his day sitting at a desk. Haque Dep. page 25 lines 23-23, A490. Haque at no time described Appellant having any decision

making authority, or doing "design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications." He described someone gathering, inputting, and presenting data.

Ms. Flaherty, who was an Assistant Commissioner to whom Haque reported, testified similarly: Appellant "gathered information and synthesized the information into reports that could be understood," "reconciled information that ensured that it was accurate" and issued a daily report. Flaherty Dep. pages 13 line 7 – 14 line14 (A80-81).

While Appellant described his role with a little more grandiosity, his supervisors made it clear that his job involved data collection, verification, inputting, and report creation using a database program created and adjusted by a programmer. He had no decision-making authority, nor was he a programmer.

In its ruling the District Court engaged in resolution of disputes of fact by simply discounting any fact issue which Appellant pointed to as unsupported, "contradictory to Schwartz own testimony," or "unexplained." The Court did this in a series of footnotes, see SPA20, 23, 24, and 25. The Court really does no analysis, and just makes sweeping pronouncements. For example, in footnote 2 on SPA20, in one of the more egregious errors, the Court states that Issue 3 of Fact

33-34 "contradicts Schwartz' testimony without reasonable explanation. But here

is the explanation on Issue of Fact Paragraph 33 (see A583-586):

> 33. As a Computer Programming Analyst, Level II, plaintiff's job duties included a "wide latitude for the exercise of independent initiative and judgment," and that he performed "more complex and responsible work in the development of computer programs." *See* Exhibit D, Pl. Dep. at 52:20-25; 53:1-6; Exhibit G, Job Description, Computer Programmer Analyst.

> **Plaintiff's Response:**

> **Denied. Plaintiff did not do "complex work in the development of computer programs." He testified that Exhibit G reflected his job duties "broadly speaking." Deposition at 53:2 and 53:8-21. And see Def. Ex. F which says he "had latitude for independent judgment" not "wide latitude," Jacob Schwartz Declaration at Paragraph 7.**

> **Plaintiff testified that he worked with computer programs (as does every person who works on a computer, be it in Word, or Adobe Acrobat, Excel, Outlook or Powerpoint). Nowhere in Plaintiff's deposition at page 52, lines 20-25 and page 53, 1-6, does he say a word about computer programs, much less programming. The testimony cited to is Plaintiff saying that a job description counsel showed him reflected his computer analyst position "broadly speaking." On pages 40-41 of Plaintiff's deposition he spoke about building a "sophisticated data tracking system" but he never testified that he wrote a program. He simply worked with Excel. He testified that he designed "several Excel workbooks that automatically calculated various metrics based off of dropping in different reports that we could pull out of the management system." See Plaintiff's deposition at Page 41, lines 2-10. An Excel workbook is a series**

of Excel spreadsheets grouped together in a single file. Excel is a program; Plaintiff had to figure out how to enter data into the program and produce reports for the decision makers above his level. Counsel for Defendant described it as a "data tracking system." See deposition at page 41, lines 17-18. Plaintiff told her that it was a "series of different reports…design progress reports, construction progress reports…five or six different reports." Page 41, lines 21-25. He actually described it as a "very simple Excel spreadsheet," Page 42, lines 23-24, not a "sophisticated computer system." Plaintiff did not come up with this idea on his own. On pages 42 line 20 through page 43 line 3 of his deposition Plaintiff used the word "we" (we realized, we developed, we needed, we made it more complicated, we needed to add more metrics). See Paragraph 7 of the Jacob Schwartz Declaration.

Mohammed Haque, Plaintiff's immediate supervisor, in his deposition (Plaintiff's Exhibit A), repeatedly made it clear that Plaintiff's job involved "collecting information and creating reports" (see, *e.g.*, page 12 line 20 – page 13 line 9), a job he did the "whole time" he was at DDC. Page 13 lines 10-13. Haque discussed how Plaintiff would "collect information" from others in the field or in the office and record the information and create reports. Page 14 line 7 – page 15 line 25. Plaintiff did not create any programs; they were purchased. Page 16 lines 11-25. An IT person was part of the team, facilitating data access and data configuration. The IT person would be given standard specs about a report and he would help create the report. Page 17 line 13 – page 21 line 20. The IT person was instructed to set up the database program to create a certain report. Page 22 line 21 – page 23 line 6. Plaintiff's job involved getting "various pieces of data and putting it into

one big report." Page 23 lines 21-23. The IT person helped make that more efficient. Page 24 lines 8-10. Plaintiff attended meetings in order to present reports or discuss the data collection process. Page 25 lines 6-8. Plaintiff spent most of his day sitting at a desk. Page 25 lines 23-23. Haque at no time described Plaintiff having any decision making authority, or doing "design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications." He described someone gathering, inputting, and presenting data.

Christine Flaherty, who was the Assistant Commissioner to whom Haque reported, testified similarly: Plaintiff "gathered information and synthesized the information into reports that could be understood," "reconciled information that ensured that it was accurate" and issued a daily report. Def. Ex. C, page 13 line 7 – page 14 line14.

Michael Kenny, the Project Executive, testified similarly in his deposition. See Plaintiff's Exhibit B. He testified that Plaintiff when hired was "tasked with building out the data base and tracking new homes." Page 10, lines 1-2. When asked what Plaintiff tracked, he testified "It would be locations, it would be visits; it would be the pathway that they were put into after we surveyed the homes; the CM that was assigned to the home, and then the contractor who was assigned and then if they flipped pathways he would track that, and then the schedule of construction, and the DOB permits, the sign offs. Multiple aspects of the project." Page 10, lines 3-11. Plaintiff would access reports that others wrote and then include the information in a daily report. Page 13, lines 15-20. Plaintiff's job was to "coordinate all of that information into a database for a daily meeting." Page 18, lines 6-8. Plaintiff

**would be corresponding daily with the field and he would be tracking data, keeping all the data on multiple spreadsheets and raise concerns. Page 23, lines 10-14. Plaintiff's data was printed out every morning on spreadsheets and used as the basis for Regional Managers and the Project Executive to check with Construction Managers. P. 30 li 20 – page 32 line 18.**

(Emphasis in the original.)

And here is the ""unreasonable explanation" in Issue of Fact 36 (A587):

36. Plaintiff testified that as he worked with over one hundred subcontractors that were hired to perform construction work as part of the BIB Program. *See* Exhibit D, Pl. Dep. at 35:1-18.

**Plaintiff's Response:**

**Admitted, although the testimony was not that he worked with over 100 contractors simultaneously. His job was to "check that they submitted the proper paperwork." 35:3-4. The defendant repeatedly asserts that Plaintiff was involved with managing contractors, citing his deposition at page 35 lines 1 -18 (which doesn't say that). But on Page 34, lines 24-25 he expressly states that he "did not manage them." The work he did was to vet their credentials. The only place where the word "managed" is used is on his resume, where he says that he "managed the vetting process." Even though that would be a minor role, since he was the only one doing the vetting, it was meant to glorify my role doing vetting. Jacob Schwartz Declaration at Paragraph 2.**

(Emphasis in original.)

Here is the "unreasonable explanation in Issue of Fact 40 (A588):

40. Plaintiff testified that DDC's BIB Program was initially utilizing "very crude Excel spreadsheets" to track information regarding the project and that he subsequently created a "sophisticated data tracking system . . . from the ground up." See Ex. D, Pl. Dep. at 40:3-12.

**Plaintiff's Response:**

**Denied in relevant part. Plaintiff testified that his work involved designing several Excel workbooks that automatically calculated various metrics based off of dropping in different reports that one could pull out of the case management system. In fact, he testified, on pages 42-43 of his deposition, that initial reports were done "by hand," and that he began to use a "very simple Excel spreadsheet." He then stated that "we" added more "metrics" which made it more complicated. At no time did he use the word "I". He testified that "we," the team that he was part of, made it more complicated. To describe what was developed a "sophisticated tracking system" to replace older "crude Excel spreadsheets" is extremely misleading. No witness used the words "sophisticated data tracking system." In his testimony it is referred to it as a "data tracking system." (Ex. D 44:2-3). Second, both the "crude" and "sophisticated" systems used Excel workbooks to perform their functions. The former was basic Excel, the latter was very advanced Excel, but both were Excel. In the last several months of his employment DDC IT moved his workbooks into SQL, since Excel was slower. Plaintiff did not do that work, however. He made it explicit in his testimony that it was all Excel. (Ex. D 41:2-25, 42:1-7). Also note: The more "sophisticated" Excel methods he used later on were all learned either from his supervisor or through Googling things while at work. None of it was based on prior knowledge. And all actual**

> **report automation outside of Excel was programmed by IT employees at DDC who helped Plaintiff's group from outside the BIB unit. Paragraph 3 Jacob Schwartz Declaration.**

(Emphasis in original.)

We could go on and on, but the fact is that the District Court worked hard to resolve issues of fact. In fact, the District Court cited to *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2nd Cir. 2001), where this Court allowed District Courts to disregard assertions "where there are no citations or where the cited materials do not support the factual assertions in the Statements, a circumstance, which this Court can clearly see, was not the case. In fact, in its footnotes, the District Court simply made sweeping pronouncements, without discussion. That is contrary to this Court's holding in *Walsh v. New York City Housing Authority*, 828 F.3d 70, 80 (2d Cir. 2016). What the District Court perceives as "a sham" comprise a set of facts from which, if proven, a reasonable jury could conclude that City's proffered reason for not paying overtime was not lawful.

# CONCLUSION

For the above-stated reasons the Decision below should be reversed, and rather than remand to allow reconsideration of the Computer Employee exemption, or litigate a summary judgment motion on the state law claims, the District Court should be directed to proceed to trial on all claims.

Dated: New York, New York
      December 28, 2021

<div style="margin-left:40%">

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
Attorneys for Appellant


By: /s/Arthur Z. Schwartz
    Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400
aschwartz@afjlaw.com

</div>

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1 because:

1.     This brief contains 12,339 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14-point proportionally spaced typeface.

Dated:  December 28, 2021

/s/Arthur Z. Schwartz
Arthur Z. Schwartz
Attorney for Appellant

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Report and Recommendation, filed
    January 22, 2020 ................................................... SPA-1

Order, filed June 3, 2020............................................ SPA-11

Opinion and Order, filed September 24, 2021 ........... SPA-19

Judgment of the United States District Court,
    Southern District of New York, filed
    September 24, 2021 .............................................. SPA-39

SPA-1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___1/22/2020___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jacob Schwartz, | 1:19-cv-05204 (AT) (SDA) |
| Plaintiff, | |
| -against- | **REPORT AND RECOMMENDATION** |
| City of New York, | |
| Defendant. | |

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE ANALISA TORRES, UNITED STATES DISTRICT JUDGE:**

Before the Court is a motion by Defendant City of New York ("Defendant" or "City"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Third Amended Complaint ("TAC") filed by Plaintiff Jacob Schwartz ("Plaintiff" or "Schwartz").[1] (Not. of Mot., ECF No. 25.) For the reasons set forth below, I respectfully recommend that Defendant's motion be GRANTED IN PART and DENIED IN PART.

---

[1] In issuing this Report and Recommendation, the Court has reviewed and considered Defendant's memorandum of law in support of the motion to dismiss (Def. Mem., ECF No. 26); Plaintiff's memorandum of law in opposition to the motion (Pl. Opp. Mem., ECF No. 35); and Defendant's reply memorandum in support of the motion. (Def. Reply Mem., ECF No. 36.) The Court also had a discussion of the issues raised in Defendant's motion during a telephone conference with the parties on January 21, 2020 addressing Plaintiff's Letter Motion for Discovery. (Pl. Letter Motion, ECF No. 45.)

## FACTS[2]

From on or about May 1, 2015 until May 20, 2017, Schwartz was employed by the City at its Department of Design and Construction ("DDC") in various titles as a "Provisional Employee." (TAC, ECF No. 24, ¶ 5.) His initial title was "Project Manager Intern" and on May 1, 2016 he was promoted to Computer Programmer Analyst. (*Id*.) Schwartz was assigned to work a 35-hour work week. (*See id*. ¶¶ 6-7.) If he worked more than 35 hours per week, he could choose to be paid hourly wages or "bank [his] time as 'Comp Time.'" (*See id*. ¶ 8.) When Schwartz worked on a holiday, he "could also bank that time as Comp Time," but "[h]oliday work was banked at 1.5 times the employee's hourly rate." (*See id*. ¶ 10.)

During the course of his employment, Schwartz "worked in excess of 35 hours in a week and banked his time" and also worked on holidays for which his time was banked. (*See id*. ¶¶ 11.a-b.) "As of May 20, 2017 [when he was terminated], according to his paycheck, [Schwartz] had banked 457 hours and 10 minutes of Comp Time" and "also banked 26 hours and 38 minutes of time worked on holidays." (*Id*. ¶ 11.b.) Moreover, he had 21 hours and 16 minutes of "earned annual leave which had not been used." (*Id*. ¶ 13.) Despite numerous requests, Schwartz has not been paid either straight time[3] or overtime pay[4] for any of the foregoing hours. (*Id*. ¶ 14.) He received his last pay check on June 2, 2017. (*Id*. ¶ 13.)

---

[2] For purposes of deciding the motion to dismiss, all factual allegations contained in the TAC are assumed to be true and all reasonable inferences are drawn in favor of the Plaintiff. *See New Jersey Carpenters Health Fund v. Royal Bank cf Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013).

[3] Plaintiff alleges that the time banked in Comp time, "even if the time worked was in excess of 40 hours" was "recorded as 'straight time.'" (TAC ¶ 8.)

[4] The Fair Labor Standards Act requires that employers pay overtime to employees working more than 40 hours a week. 29 U.S.C. § 207(a). Schwartz identifies 33 weeks during which he worked more than 40 hours per week, totaling 144 overtime hours. (*See* TAC ¶ 11.c.)

The TAC alleges four claims: (1) a violation of the Fair Labor Standards Act ("FLSA") for failure to pay Plaintiff his overtime pay (TAC ¶¶ 16-17); (2) a violation of Section 12-108 of the Administrative Code of the City of New York for failure to pay Plaintiff his overtime pay (*id*. ¶¶ 18-21); (3) breach of oral contract for failure to pay Plaintiff for his Comp Time (*id*. ¶¶ 22-25); and (4) *quantum meruit*—i.e., that Plaintiff, at a minimum, should be paid his Comp Time at "the straight-time hourly rate." (*Id*. ¶¶ 26-28.)

## LEGAL STANDARDS

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc*., 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion to dismiss, courts must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *L.C. v. LeFrak Org., Inc*., 987 F. Supp. 2d 391, 398 (S.D.N.Y. 2013) (quoting *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009)). "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros*., 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008)).

## DISCUSSION

The Court addresses the four arguments raised by Defendant in support of its motion to dismiss in turn.

I.    **FLSA Statute Of Limitations**

Defendant argues that Plaintiff's FLSA claim is time-barred. (Def. Mem. at 1-4.) The statute of limitations under the FLSA is generally two years, but extends to three years for willful violations: "[E]very . . . action [to enforce a cause of action for overtime compensation under the FLSA] shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).

The question here is when Plaintiff's FLSA claim accrued. Section 207(o)(1) of the FLSA provides:

> Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.

29 U.S.C. § 207(o)(1). Section 207(o)(4), upon which Plaintiff's First Cause of Action is based (TAC ¶ 16), provides:

> An employee who has accrued compensatory time off authorized to be provided under paragraph (1) shall, upon termination of employment, be paid for the unused compensatory time at a rate of compensation not less than—
>
> (A) the average regular rate received by such employee during the last 3 years of the employee's employment, or
>
> (B) the final regular rate received by such employee, whichever is higher.

29 U.S.C. § 207(o)(4).

At the very earliest, Plaintiff's First Cause of Action accrued upon his termination. *See Oliver v. Layrisson*, No. 95-CV-00003 (MLS), 1996 WL 80097, at *2 (E.D. La. Feb. 21, 1996) (applying 29 U.S.C. § 207(o)(4), court held: "Clearly, plaintiff's cause of action for unused

compensatory time did not accrue until the date of his termination . . ..”), *aff'd*, 106 F.3d 397 (5th Cir. 1997) (“As a legal matter, we agree with the district court that payment for unused compensatory time is due 'upon termination of employment' under § 207(o)(4), that [plaintiff's] claim for this payment accrued on the date of termination, and that suit therefore was timely brought within two years of this date.”).[5]

In the present case, Plaintiff was terminated on May 20, 2017. (TAC ¶ 12.) His last pay check was on June 2, 2017. (TAC ¶ 13.) However, since Plaintiff could not have known that he was not paid for his accrued compensatory time until he received his last pay check, the Court finds that his cause of action under Section 207(o)(4) did not accrue until June 2, 2017.[6] This case was filed on Monday, June 3, 2019. Since the last day of the limitations period (*i.e.*, June 2, 2019) was a Sunday, the statute of limitations expired on Monday, the very day this case was filed. *See* Fed. R. Civ. P. 6(a)(1)(C). Thus, even if a two-year statute of limitation applies here, Plaintiff's First Cause of Action is timely.

Even assuming, *arguendo*, that Plaintiff's First Cause of Action accrued upon his termination on May 20, 2017 (rather than the day of his last pay check), such cause of action would be timely if a three-year statute of limitations for willful violations applies. *See* 29 U.S.C. § 255(a). Under the FLSA, the plaintiff bears the burden of proving willfulness for purposes of

---

[5] *See also Burnett v. Walker Cty. Comm'n*, No. 13-CV-01506 (HNJ), 2018 U.S. Dist. LEXIS 114572, *3 (N.D. Ala. May 16, 2018) (“To the extent a limitations period applies [to FLSA claim for unused compensatory time], it serves to preclude liability if a plaintiff files suit on this provision beyond the two- or three-year period following termination . . ..”).

[6] The City argues that Plaintiff's FLSA claim accrued “each regular payday immediately following the workweek during which services were rendered and for which overtime compensation is claimed.” (Def. Mem. at 2.) However, since payment of unused compensatory time was not due until termination, *see* 29 U.S.C. § 207(o)(4), the Court finds that Plaintiff's claim accrued on his last payday after his termination.

expanding the statute of limitations to three years, and "[a]ll that is required is that the employer knew or had reason to know that it was or might have been subject to the FLSA." *Juarez-Cardoso v. La Flor de Santa Ines, Inc.*, No. 15-CV-06671, 2017 WL 4357009, at *11 (E.D.N.Y. Sept. 29, 2017) (quoting *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F. Supp. 860, 870 (S.D.N.Y. 1984)). The standard for determining willful behavior is whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Given the fact-intensive nature of the willfulness inquiry, the Court does not believe that it can or should be resolved on a motion to dismiss. *See Agureyev v. H.K. Second Ave. Rest. Inc.*, No. 17-CV-07336 (HBP), 2018 WL 4356731, at *3 (S.D.N.Y. Sept. 12, 2018) ("Whether plaintiff has sufficiently shown a willful violation is an issue ordinarily left to the trier of fact; it is not properly determined in the context of a Rule 12(b)(6) motion to dismiss."). Plaintiff alleges that "New York City has, for many years, deliberately ignored the fact that most of its Career and Salary and non-clerical/non-blue collar employees are eligible for overtime pay under the Fair Labor Standards Act since many of those in these titles do non-exempt work and are paid in hourly increments." (TAC ¶ 9.) Plaintiff also cites FLSA cases previously filed against the City. (*See id.*) The Court finds that these allegations are sufficient, particularly in the context of a pre-answer motion, to plead the requisite willfulness. *See Lynch v. City of New York*, 291 F. Supp. 3d 537, 554 (S.D.N.Y. 2018) (finding the existence of other FLSA lawsuits against City raised triable issues as to willfulness).

Thus, Defendant's motion to dismiss Plaintiff's FLSA claim on limitations grounds should be denied.

## II.      Plausibility Of FLSA Claim

Defendant next argues that Plaintiff fails to plausibly state a FLSA violation. (Def. Mem. at 6-8.) This argument lacks merit. "[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v. Catholic Health Sys. of Long Island Inc*., 711 F.3d 106, 114 (2d Cir. 2013) (citing 29 U.S.C. § 207(a)(1)). Here, Plaintiff alleges that, based upon "clock-in" and "clock-out" records, he worked in excess of 40 hours in certain weeks for which he was not compensated. (*See* TAC ¶¶ 11.c., 13-14.) Thus, he has stated a plausible FLSA claim.

## III.      New York City Administrative Code Claim

Plaintiff's Second Cause of Action is brought under Section 12-108 of the New York City Administrative Code. (TAC ¶¶ 18-21.) That section provides in relevant part: "[T]he mayor may authorize the head of any agency to require any . . . group of . . . employees in such agency to work in excess of the maximum number of hours of employment prescribed for such . . . group of . . . employees by any statute, general, special or local, provided that each such officer or employee shall be paid overtime compensation for such work at not less than his or her regular basic pay rate." New York City, N.Y., Code § 12-108. Plaintiff alleges that "[a]t all relevant times the Commissioner of DDC was authorized by the Mayor to require employees to work in excess of the maximum number of hours (35) prescribed for DDC employees." (*Id*. ¶ 19.) Thus, Plaintiff alleges that, by failing to pay him for his time worked, the City violated Section 12-108. (*See id*. ¶ 21.)

Defendant argues that Plaintiff does not point to any "'statute, general, special or local' establishing 35 hours each week as 'the maximum number of hours of employment.'" (Def. Mem.

at 8.) The Court agrees, and thus Plaintiff's claim under Section 12-108 should be dismissed. *See Yourman v. Dinkins*, 826 F. Supp. 736, 748 (S.D.N.Y. 1993), *decision supplemented*, 865 F. Supp. 154 (S.D.N.Y. 1994), *aff'd*, 84 F.3d 655 (2d Cir. 1996), *cert. granted, judgment vacated on other grounds sub nom. Giuliani v. Yourman*, 519 U.S. 1145 (1997).[7]

## IV.   Plaintiff's Common Law Claims

In Plaintiff's Third and Fourth Causes of Action, which allege claims for breach of an oral contract (TAC ¶ 25) and *quantum meruit* (*id*. ¶ 28), he seeks damages for his lost wages. (*See id*. ¶ 29.) As Defendant notes (Def. Mem. at 9-10), a contract or quasi-contract claim for lost wages by a public employee who has been terminated must be brought in an Article 78 proceeding. *See Finley v. Giacobbe*, 848 F. Supp. 1146, 1150 (S.D.N.Y. 1994) ("[W]e conclude that New York law requires that breach of employment contract claims be brought by article 78 proceedings."), *aff'd*, 79 F.3d 1285, 1292 (2d Cir. 1996) ("It is . . . clear . . . that a successful article 78 proceeding for reinstatement is a prerequisite to a claim for damages by a discharged public employee.").[8] In his Opposition Memorandum, Plaintiff quotes a portion of the *Finley* case which addresses employees who have been suspended, not terminated. (Opp. Mem. at 17.) Employees who are

---

[7] Although not raised by the City in its motion, Plaintiff's claim under the City Administrative Code, in any event, should have been brought under Article 78 of the New York Civil Practice Law and Rules within four months after his last paycheck. *See Menoudakos v. City of New York*, 74 A.D.2d 897, 897 (2d Dep't 1980) (finding claim under Section 1103-4.0 (now Section 12-108) of the New York City Administrative Code time-barred by four-month statute of limitations for Article 78 proceedings, N.Y. C.P.L.R. § 217); *see also Turner v. New York Div. of State Police*, 148 A.D.3d 1335, 1336 (3d Dep't 2017) ("If, as petitioner claims, respondent failed to pay him overtime due for that time period, it was incumbent upon petitioner to commence a CPLR article 78 proceeding within four months after the receipt of his last paycheck inasmuch as his claim for overtime back pay continuously accrued upon his receipt of each paycheck between 2008 and 2012.").

[8] Article 78 proceedings may encompass both claims sounding in breach of contract, as well as quasi-contractual claims like unjust enrichment and *quantum meruit. See, e.g., Broderick v. Bd. of Educ., Roosevelt Union Free Sch. Dist.*, 253 A.D.2d 836, 837 (2d Dep't 1998).

"under suspension" may "maintain actions at law for back salary withheld in contravention of their rights under the New York Civil Service Law." *Finley*, 79 F.3d at 1292. However, as the Second Circuit held, when a public employee has been discharged, a successful Article 78 proceeding must be brought before a claim for damages. *Finley*, 79 F.3d at 1292; *see also Ingrassia v. Cty. of Sullivan, New York*, 262 F. Supp. 2d 116, 120 (S.D.N.Y. 2003).

As noted in footnote 7, *supra*, Article 78 proceedings are governed by a four-month statute of limitations. *See* N.Y. C.P.L.R. § 217. That statute of limitations has long since lapsed since Plaintiff received his last paycheck on June 2, 2017. *See Turner*, 148 A.D.3d at 1336 ("it was incumbent upon petitioner to commence a CPLR article 78 proceeding within four months after the receipt of his last paycheck"). Thus, I recommend that the Third and Fourth Causes of Action be dismissed.

<u>**CONCLUSION**</u>

For the foregoing reasons, I respectfully recommend that Defendant's motion to dismiss the Third Amended Complaint be GRANTED IN PART and DENIED IN PART, as follows:

1. Defendant's motion to dismiss Plaintiff's First Cause of Action should be denied; and

2. Defendant's motion to dismiss Plaintiff's Second, Third and Fourth Causes of Action should be granted and those causes of action should be dismissed in their entirety.

**SO ORDERED.**

DATED:   January 22, 2020
         New York, New York

STEWART D. AARON
United States Magistrate Judge

\*          \*          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Torres.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACOB SCHWARTZ,

<div style="text-align:center">Plaintiff,</div>

<div style="text-align:center">-against-</div>

CITY OF NEW YORK,

<div style="text-align:center">Defendant.</div>

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  6/3/2020
```

<div style="text-align:center">19 Civ. 5204 (AT)</div>

<div style="text-align:center"><strong><u>ORDER</u></strong></div>

ANALISA TORRES, District Judge:

Plaintiff, Jacob Schwartz, brings this action against Defendant, City of New York, alleging that Defendant (1) failed to make overtime payments to Plaintiff in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and Section 12-108 of the Administrative Code of the City of New York ("Section 12-108"), (2) breached an oral contract by failing to pay Plaintiff for "Comp Time,"[1] and (3) under the theory of *quantum meruit,* is indebted to Plaintiff for Comp Time. Compl. ¶¶ 16–28, ECF No. 24. Defendant moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 25. After the motion was referred to the Honorable Stewart D. Aaron for a Report and Recommendation ("R&R"), ECF No. 37, Judge Aaron recommended that the motion be granted with respect to all causes of action except for the FLSA claim, R&R at 9, ECF No. 52. Before the Court are Plaintiff's objections to the R&R. Pl. Obj., ECF No. 54. For the reasons stated below, Plaintiff's objections are OVERRULED and the R&R is ADOPTED.

---

[1] As alleged in the complaint, Plaintiff could choose for time worked in excess of 35 hours in a given week to be paid in hourly wages or "banked" as "Comp Time." Compl. ¶ 8, ECF No. 24.

## BACKGROUND[2]

From May 2015 to May 2017, Defendant employed Plaintiff in its Department of Design and Construction ("DDC") in various titles as a "Provisional Employee."  R&R at 2.  Plaintiff's initial title was Project Manager Intern and on May 1, 2016, he was promoted to Computer Programmer Analyst.  *Id.*  Plaintiff was assigned to work a 35-hour workweek and if he worked more than 35 hours per week, he could choose to be paid hourly wages or "bank" his time as Comp Time.  *Id.*  Plaintiff could also bank as Comp Time hours he worked on a holiday, except that holiday work was banked at 1.5 times his hourly rate.  *Id.*

Plaintiff was terminated on May 20, 2017, and received his last paycheck on June 2, 2017.  *Id.*  According to his paycheck, Plaintiff had banked 457 hours and 10 minutes of Comp Time and 26 hours and 38 minutes of time worked on holidays.  *Id.*  He also had 21 hours and 16 minutes of earned annual leave, which had not been used.  *Id.*  Plaintiff was not paid for these hours, either at the usual hourly rate, or at the overtime rate.  *Id.*

On September 20, 2019, Defendant moved to dismiss the complaint for failure to state a claim.  ECF No. 25.  The Court referred the motion to Judge Aaron for an R&R.  ECF No. 37.  Judge Aaron recommends that the motion be granted with respect to all causes of action except for Plaintiff's FLSA claim.  R&R at 9.

## DISCUSSION

### I.    Standard of Review

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  When a party makes

---

[2]  The Court presumes familiarity with the facts and procedural history as set forth in the R&R, *see* R&R at 2–3, but will reiterate some key factual allegations here.  Because the parties do not dispute the facts as stated in the R&R, the Court adopts the R&R's "Background" section.  *See Roberts ex rel. Phillip v. Happiness is Camping Inc.*, No. 10 Civ. 4548, 2012 WL 844331, at *1 (S.D.N.Y. Mar. 13, 2012).

specific objections, the court reviews *de novo* those portions of the report and recommendation that have been properly objected to. *Id.*; Fed. R. Civ. P. 72(b)(3). However, "when a party makes only conclusory or general objections, or simply reiterates his original arguments," the court reviews the report and recommendation strictly for clear error. *Wallace v. Superintendent of Clinton Corr. Facility*, No. 13 Civ. 3989, 2014 WL 2854631, at *1 (S.D.N.Y. June 20, 2014); *see also Bailey v. U.S. Citizenship & Immigration Serv.*, No. 13 Civ. 1064, 2014 WL 2855041, at *1 (S.D.N.Y. June 20, 2014) ("[O]bjections that are not clearly aimed at particular findings in the [report and recommendation] do not trigger *de novo* review."). An order is clearly erroneous if the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks and citation omitted).

In addition, "new arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." *Razzoli v. Fed. Bureau of Prisons*, No. 12 Civ. 3774, 2014 WL 2440771, at *5 (S.D.N.Y. May 30, 2014). The court may adopt those portions of the report and recommendation to which no objection is made "as long as no clear error is apparent from the face of the record." *Oquendo v. Colvin*, No. 12 Civ. 4527, 2014 WL 4160222, at *2 (S.D.N.Y. Aug. 19, 2014) (internal quotation marks and citation omitted).

II.   Plaintiff's Objections

A.  New York City Administrative Code Claim

Plaintiff's second cause of action is brought under Section 12-108 of the New York City Administrative Code. Compl. ¶¶ 18–21. That section provides that "the mayor may authorize the head of any agency to require any . . . employee in such agency or any class or group

3

of . . . employees in such agency to work in excess of the maximum number of hours of employment prescribed for such . . . employee or class or group of . . . employees by any statute, general, special or local, provided that each such . . . employee shall be paid overtime compensation for such work at not less than his or her regular basic pay rate."  New York City Administrative Code § 12-108.  Plaintiff alleges that the DDC Commissioner was authorized by the Mayor to require employees to work in excess of the maximum number of hours (35) prescribed for DDC employees.  Comp. ¶ 19.

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Judge Aaron found that Plaintiff failed to state a claim to relief under Section 12-108 because the complaint did not point to any "statute, general, special or local" establishing 35 hours each week as the maximum numbers of hours of employment.  R&R at 7–8.  Plaintiff objects, arguing that Judge Aaron overlooked paragraph 7 of the complaint which identified a DDC employee manual setting forth a 35-hour work week.  Pl. Obj. at 2.  Because Plaintiff "reiterates" the same arguments made to Judge Aaron, *Wallace*, 2014 WL 2854631, at *1 the Court reviews the objection for clear error and finds none. *Compare* Pl. Obj. at 2 *with* Pl. Opp. at 3, 15, ECF No. 35.

Section 12-108's language is clear.  It allows for overtime compensation where an employee has been directed "to work in excess of the maximum number of hours of employment prescribed for such . . . employee . . . by any *statute*, general, special or local."  New York City

4

Administrative Code § 12-108.  An employee manual is not a statute and Plaintiff has not presented any authority holding otherwise.  *See Yourman v. Dinkins*, 826 F. Supp. 736, 748 (S.D.N.Y. 1993), *decision supplemented*, 865 F. Supp. 154 (S.D.N.Y. 1994), and *aff'd*, 84 F.3d 655 (2d Cir. 1996), *cert. granted, judgment vacated on other grounds sub nom. Giuliani v. Yourman*, 519 U.S. 1145 (1997) (dismissing claim brought under § 12-108 because plaintiffs "point to no 'statute, general, special or local' establishing thirty-five hours each week as 'the maximum number of hours of employment'" (citation omitted)).

Accordingly, Plaintiff's objection that Judge Aaron overlooked the complaint's mention of the DDC employment manual is OVERRULED.

B.  Common Law Claims

Plaintiff's third and fourth causes of action allege claims for breach of an oral contract, Compl. ¶ 25, and *quantum meruit*, *id.* ¶ 28, seeking damages for his lost wages.  Judge Aaron determined that these claim should be dismissed for failure to state a claim because a contract claim for lost wages by a public employee whose been terminated must be brought in a proceeding under Article 78 of the New York Civil Practice Law and Rules, which Plaintiff did not do.  R&R at 8–9.  Moreover, Judge Aaron noted that Article 78 proceedings are governed by a four-month statute of limitations, which has "long since lapsed since Plaintiff received his last paycheck on June 2, 2017." *Id.* at 9 (citing N.Y. C.P.L.R. § 217).  Plaintiff objects, contending that an Article 78 proceeding is not the appropriate vehicle for Plaintiff to pursue his breach of contract and *quantum meruit* claims, because he is "not seeking reinstatement or challenging his discharge."  *See* Pl. Obj. at 3.  The Court disagrees.

Because Plaintiff rehashes the same arguments made to Judge Aaron, *compare* Pl. Obj. at 3–5, *with* Pl. Opp. at 16–17, the Court reviews the objection for clear error, *Wallace*, 2014 WL

2854631, at *1, and finds none.  Plaintiff's argument that an Article 78 proceeding is not

required because he is not seeking reinstatement or challenging his discharge has been rejected

by the Second Circuit.  *See Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("[Plaintiff]

advances two arguments to challenge the district court's determination that she should first have

brought her claim in an [A]rticle 78 proceeding:  first, that a public employee's claim seeking

damages as the principal form of relief—*rather than reinstatement or back pay*—is akin to a

contract claim, an action at law that need not first be brought in an [A]rticle 78 proceeding . . . .")

(emphasis added).  The Second Circuit acknowledged that Article 78 is inapplicable to contract

actions against the state where a party seeks damages as the principal remedy.  *Id.*  However, the

court of appeals noted that "a successful article 78 proceeding for reinstatement is a prerequisite

to a claim for damages by a discharged public employee."  *Id.* at 1292 ("This seeming

contradiction is reconciled by New York's view that public employment claims were historically

based on property rather than contract principles."); *see also Clancy v. State*, 481 N.Y.S.2d 943,

945 (Ct. Cl. 1984) ("[A] breach of contract action for lost wages [against the state] may not be

maintained since claimant has not obtained reinstatement to her former position via an Article 78

proceeding, a condition precedent to such an action against a public employer.").

In support of his position, Plaintiff relies primarily on *Gerber v. NYC Housing Authority*,

42 N.Y.2d 162, 165 (1977), where the New York Court of Appeals stated that a "claim for

accrued salary may be made by way of an action at law, and it is not necessary to commence an

Article 78 proceeding."  *Gerber*, however, concerned whether a public employee could recover

back pay, without first initiating an Article 78 proceeding, when he was suspended for a period

in excess of what is permitted under New York State Civil Service Law Section 75.  *See id.* at

164–65.  But as the Second Circuit noted, *Gerber* is "distinguishable . . . because [it] involve[s]

6

suspension [of an employee] rather than termination." *Finley*, 79 F.3d at 1292; *see also* R&R at 8 ("In his [opposition], Plaintiff quotes a portion of the *Finley* case which addresses employees who have been suspended, not terminated."). As Judge Aaron concluded, because Plaintiff is a discharged employee, as opposed to a suspended one, "a successful Article 78 proceeding must be brought before a claim for damages." R&R at 9 (citing *Finley*, 79 F.3d at 1292).

In any event, Article 78 proceedings are governed by a four-month statute of limitations. *See* N.Y. C.P.L.R. § 217. Judge Aaron held that the statute of limitations began to run when Plaintiff received his last paycheck on June 2, 2017. R&R at 9; *see also Turner v. New York Div. of State Police*, 50 N.Y.S.3d 175 (N.Y. App. Div. 2017) ("[I]t was incumbent upon petitioner to commence a CPLR [A]rticle 78 proceeding within four months after the receipt of his last paycheck . . . ."). Plaintiff objects, "arguing that there is a question of when the causes of action for *quantum meruit* and breach of contract accrued." Pl. Obj. at 4–5. Although Plaintiff makes a new argument not previously made to Judge Aaron, the Court reviews and overrules the objection. *See Razzoli*, 2014 WL 2440771, at *5 ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all."). Even assuming that there were, as Plaintiff suggests, some ambiguity as to when the causes of action for *quantum meruit* and breach of contract accrued, this would not absolve Plaintiff of the requirement to initiate an Article 78 proceeding before bringing his claim for damages. *See Finley*, 79 F.3d at 1292; *see also id.* ("The primacy of [A]rticle 78 proceedings conserves public money by forcing a quick and efficient resolution of claims against state agencies.").

Accordingly, Plaintiff's objection that a successful Article 78 proceeding was not required before bringing a claim for damages is OVERRULED.

## CONCLUSION

The Court has reviewed *de novo* those portions of the R&R to which Plaintiff properly objected and has reviewed the remainder of the R&R for clear error.[3]  For the reasons stated above, the Court ADOPTS the R&R in its entirety, and DISMISSES counts two, three, and four of the complaint.

The parties are ORDERED to appear for a case management conference on June 24, 2020, at 10:20 a.m.  By June 17, 2020, the parties shall submit their joint status report.  *See* ECF No. 32 ¶ 16.  It is further ORDERED that Defendant's request that the time to file a pre-motion conference request in connection with Defendant's anticipated summary judgment motion be extended until 14 days after this order, ECF No. 58, is GRANTED.  Any pre-motion conference request must be made by June 17, 2020.  The Clerk of Court is directed to terminate the motions at ECF Nos. 25 and 58.

SO ORDERED.

Dated: June 3, 2020
      New York, New York

                                     ANALISA TORRES
                           United States District Judge

---

[3] To the extent not discussed above, the Court finds no clear error in the unchallenged portions of the R&R.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                          :
JACOB SCHWARTZ,                                           :
                                                          :
                               Plaintiff,                 :
                                                          :                19 Civ. 5204 (JPC)
                   -v-                                    :
                                                          :            OPINION AND ORDER
                                                          :
THE CITY OF NEW YORK,                                     :
                                                          :
                               Defendant.                 :
                                                          :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Jacob Schwartz sued his former employer, the City of New York (the "City"), for non-payment of wages. Dkt. 24 ("Third Am. Compl."). The Court previously dismissed three of the four claims in Schwartz's Third Amended Complaint. Dkt. 62. Now before the Court is the City's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the only remaining claim in this action—that the City violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay Schwartz overtime for work performed in excess of forty hours in a given week. For the reasons that follow, the City's motion is granted.

# I. Background[1]

## A. Factual Allegations[2]

Schwartz worked at the New York City Department of Design and Construction ("DDC") from May 5, 2015 to May 28, 2017. Def. 56.1 Stmt. ¶¶ 1-2. Schwartz is a college graduate with a bachelor's degree in electrical engineering. Dkt. 75 ("Schwartz Dep. Tr.") at 9:17-23.

While working for the City, Schwartz worked on the Build It Back Program ("BIB Program") unit within the DDC. Def. 56.1 Stmt. ¶¶ 19-20; Schwartz Dep. Tr. at 33:25-34:3. The Mayor's Office of Housing Recovery Operations launched the BIB Program to help families after Hurricane Sandy by coordinating home repairs, rebuilding, and improvements. Def. 56.1 Stmt. ¶ 17. The City did so by providing reimbursement checks or construction services, or by acquiring families' homes. *Id.* ¶ 18.

At the time Schwartz was hired, the BIB Program unit was just being formed, and Schwartz was one of its first employees. *Id.* ¶ 19. Schwartz initially worked as a Project Manager Intern, for

---

[1] The following facts are drawn from the City's statement of material facts pursuant to Local Civil Rule 56.1, Dkt. 76 ("Def. 56.1 Stmt."), Schwartz's response to the City's statement of material facts, Dkt. 92 ("Pl. Counter 56.1 Stmt."), and the declarations submitted in support of and in opposition to the City's motion for summary judgment, as well as the exhibits attached thereto. Unless otherwise noted, the Court cites to only one party's Rule 56.1 Statement or Counter 56.1 Statement where the parties do not dispute the fact, the adverse party has offered no admissible evidence to refute that fact, or the adverse party simply seeks to add its own "spin" on the fact or otherwise dispute the inferences from the stated fact.

[2] Except where cited to below, Schwartz's Counter 56.1 Statement fails to create an issue of fact, as it contradicts Schwartz's own testimony without any reasonable explanation, *see, e.g.*, Pl. Counter 56.1 Stmt. ¶¶ 22-23, 28, 33-34, 36, 39-41, 43, 48, 52, 68, 72, or makes conclusory denials without any supporting evidence, *id.* ¶¶ 35, 59, 60, 72, 77. *See* Local Civ. R. 56.1; *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013) (instructing that a court "may determine that a [party] has manufactured a sham issue of fact" if there is an "unexplained" discrepancy between the new fact and the party's prior testimony); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001) ("[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (internal quotation marks and alterations omitted)).

which he earned a salary of $52,000. *Id.* ¶¶ 14-15. However, Schwartz only performed the role of a Project Manager Intern during his first month of employment. *Id.* ¶ 26; Schwartz Dep. Tr. at 49:5-15. After that, while he maintained the same job title, Schwartz performed the work of an Acting Document Control and Data Analyst and was a "leading data analyst for the [BIB] project." Def. 56.1 Stmt. ¶¶ 27-28; Schwartz Dep. Tr. at 49:5-15. In May 2016, Schwartz was promoted to the civil service title Computer Programming Analyst, Level II, with a salary of $66,360. Def. 56.1 Stmt. ¶¶ 30-31. Schwartz testified that to get that promotion, he was required to have taken a course in computer technology. Schwartz Dep. Tr. at 51:3-10.

According to the job description, a Computer Programmer Analyst II was to act "[u]nder general direction and with wide latitude for the exercise of independent initiative and judgment." Dkt. 75, Exh. G at 2. A Computer Programmer Analyst II was tasked with "[c]od[ing] program instructions"; "[a]ssist[ing] in surveys and feasibility studies"; "[d]ocument[ing] computer systems and programs"; "[a]ssist[ing] in writing procedure manuals"; and "[m]eet[ing] with users of computer services" to "explain[] the procedures and standards required"; as well as "perform[ing] more complex and responsible work in the development of computer programs." *Id.* at 1-2. According to the "salary justification," a Computer Programmer Analyst II, with "latitude for independent judgment," was to "be responsible for review and analysis of various data and document submissions in Case Management System [('CMS')]," New York City's Housing Recovery Office's "master system of record"; "act[] as a primary client liaison"; "assist[] with the development of overall functions and document management in CMS"; and "create[e] various reports from CMS and reconcile any data anomalies in CMS." Dkt. 75, Exh. F; *id.*, Exh. C ("Flaherty Dep. Tr.") at 15:3-7. The salary justification also stated that Schwartz's "[r]esponsibilities can include developing various tracking mechanism[s] and reports for [the] BIB

3

program."  Dkt. 75, Exh. F.  Schwartz testified that "[b]roadly speaking," the job description accurately reflected his job duties, Schwartz Dep. Tr. at 52:25-53:6, and that the salary justification accurately reflected "some" of his job duties, *id.* at 53:7-21.

Schwartz also testified during his deposition that his job responsibilities were the same before and after he was promoted.  Def. 56.1 Stmt. ¶ 32; Schwartz Dep. Tr. at 49:16-19.  Schwartz testified that when he was first hired, he was assigned with "reviewing maps to find the locations of fire hydrants so that . . . the fire department could be notified about upcoming construction" and "contacting subcontractors to verify their contract information."  Schwartz Dep. Tr. at 14:23-15:3. But, "[a]fter a couple of days," Schwartz was assigned to Mohammed Haque's team, where they "started building reporting metrics for progress on the project," meaning he was "keeping track of" things like "how much money [they] were projecting to spend on various forms of construction, how long [they] were projecting the project to take based off of contracts," and "what types of construction each home was going to go through."  *Id.* at 15:4-14.

Schwartz stated on his resume that as a Project Manager Intern, he "[m]anaged subcontractor [and] work[-]order vetting, mapping of work areas, script [and] presentation development[,] [and] internal systems testing."  Dkt. 75, Exh. E.  As Schwartz explained, the Housing Recovery Office would assign houses for the DDC to work on via a work order.  Schwartz Dep. Tr. at 35:21-23.  The work orders would include, among other things, a list of addresses where work was to be done; the names of the individuals in those homes; the type of work that needed to be done, *i.e.*, elevation, reconstruction, or rehabilitation; and the approximate project cost.  *Id.* at 35:23-36:9.  Schwartz testified that he helped perform "most" of the work-order vetting, which took approximately twenty percent of his time.  *Id.* at 37:2-23.

Schwartz testified that he did not actually manage the subcontractors, but instead worked with approximately one hundred subcontractors to "[h]elp[] clarify project parameters" and "check[] to make sure that they had filed the proper paperwork to be considered for various pieces of the job." *Id.* at 34:22-35:18.  To vet the work orders, Schwartz and others had a "checklist of things that [they] had to go through," including confirming the projects "fit the required parameters" and had the proper paperwork in CMS.  *Id.* at 36:10-14, 24-25; Pl. Counter 56.1 Stmt. ¶ 37.  They also had to vet them for location "so that [they] knew which construction management firms to assign them to."  Schwartz Dep. Tr. at 36:21-23.  Schwartz would also resolve the "[c]onstant" problems that arose during vetting.  *Id.* at 37:24-38:16.

Schwartz testified that he would "adjust the budgeting" based on the projects his team was assigned.  *Id.* at 56:3-6.  Schwartz and his team were given a description of the average cost of each type of project, and Schwartz had to "project how much money it would cost to do all of the projects based off of those individual estimations."  *Id.* 55:15-21.  This was an ongoing, long-term task: "[A]s the project moved forward, the construction management firms revised their estimates of what different pathways were going to cost. . . .  [S]o those adjustments were also added into the budget estimates."  *Id.* at 56:7-11.

Schwartz also created a system to better track the project data.  Schwartz testified that the team initially calculated various metrics and reports on the status of the project by hand.  *Id.* at 42:15-24.  They then used "very crude Excel spreadsheets," *id.* at 40:5-7, until Schwartz "built from the ground up" a "sophisticated data tracking system," *id.* at 40:7-12.[3]  Specifically, Schwartz

---

[3] As noted above, Schwartz repeatedly denies his own testimony, including this statement. *See* Opposition at 14, 16-17.  Schwartz cannot create a material issue of fact by simply denying his own statements without any real explanation.  *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d at 194 (instructing that a court "may determine that a [party] has manufactured a sham issue of

"designed several Excel workbooks that . . . automatically calculated various metrics." *Id.* at 41:2-10. Schwartz testified that he was not assigned to make the new tracking system. *Id.* at 42:8-43:3. By the time Schwartz left, this system executed five or six different reports on a daily basis. *Id.* at 43:7-14. In addition, Schwartz would, in connection with this data tracking system, "go to the various boroughs to train team members in how to enter the data." *Id.* at 46:17-47:4.

In his role—which he unofficially termed "the lead project analyst"—Schwartz worked directly with high-level City administrators. *Id.* at 47:25-48:1.[4] He testified that he "frequently was assigned to write up short statements or PowerPoint presentations for the [A]ssistant [C]ommissioner [of DDC] . . . to present to the [C]ommissioner or to the [A]ssociate [C]ommissioner or to any other departmental heads about progress on the project," including "progress numbers" and "descriptions of any . . . ongoing successes or problems." *Id.* at 39:19-40:1. Schwartz was "frequently called upon to sit and meet with the [A]ssociate [C]ommissioner, the [C]ommissioner himself, [and] the head of the Housing Recovery Office," and "attended meetings at City Hall several times with the [D]eputy [M]ayor." *Id.* at 48:4-7. He attested that he "directly advise[d]" the Assistant Commissioner "[a]lmost daily." *Id.* at 56:15-17.

While he was employed, Schwartz was a member of a union, District Council 37, meaning the terms of his employment with DDC were covered by the collective bargaining agreement

---

fact" if there is an "unexplained" discrepancy between the new fact and the party's prior testimony).

[4] Schwartz states that he "was 'a' lead representative, not 'the' lead representative." Opposition at 15; *see also* Dkt. 91 ("Schwartz Declaration") ¶¶ 4 ("On page 5 of counsel's brief it states that I was 'the' lead representative of the BIB Program . . . . [A]ll I stated was that I was 'a' lead representative, who attended meetings at City Hall 'several times.'" (citing Schwartz Dep. Tr. at 48:4-8)), 8 ("[C]ounsel again calls me 'the' lead data analyst and DDC's 'lead representative,' but nowhere in the deposition, on the pages cited, . . . did I say I was anything other than 'a' lead representative in terms of data."). But the testimony reflects that Schwartz did in fact testify he was "the lead project analyst." Schwartz Dep. Tr. at 47:25-48:1.

("CBA") entered into between the union and the City's Office of Labor Relations. Def. 56.1 Stmt. ¶ 61. Under the CBA, Schwartz was entitled to earn either cash or compensatory time when he worked over thirty-five hours in one week. *Id.* ¶ 62. If Schwartz worked a holiday, he was also entitled to earn overtime pay at a one-and-a-half rate in cash or compensatory time. *Id.* ¶ 63. An employee can use compensatory time as paid time off work. *Id.* ¶ 64.

At the time of his termination, Schwartz had banked 457 hours and ten minutes of compensatory time for time worked over thirty-five hours per week, and twenty-six hours and twenty-eight minutes of compensatory time for time worked on holidays. *Id.* ¶ 78. Schwartz testified that it was his practice to request overtime in the form of compensatory time because he "felt that the time was more valuable to [him] as potential leave time than it was as additional straight pay on [his] paycheck." Schwartz Dep. Tr. at 26:24-27:8. On some weeks, Schwartz worked more than forty hours per week. *See* Schwartz Declaration ¶ 12, Exh. 1.[5] Schwartz states

---

[5] The Court rejects the City's argument that Schwartz's declaration must be disregarded because it does not substantially comply with 28 U.S.C. § 1746, which governs the admissibility of declarations made under penalty of perjury. *See* Dkt. 97 ("Reply") at 1-3; 28 U.S.C. § 1746 (requiring unsworn declarations be "in substantially the following form": "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)."). While Schwartz did not specifically state that the facts therein were "true and correct," he did "declare[] under penalty of perjury" at the start of his declaration. Schwartz Declaration at 1; *see Redman v. N.Y. State Dep't of Corr. Servs.*, No. 10 Civ. 5368 (VB), 2015 WL 897434, at *1 n.2 (S.D.N.Y. Feb. 23, 2015) (finding that a declaration made "under penalty of perjury" but that did not state the facts were "true and correct" substantially complied with section 1746).

However, the Court does not credit Schwartz's declaration where it is in conflict with his previous deposition testimony, as Schwartz has provided no explanation for these discrepancies. *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d at 194. Nor does the Court credit the legal arguments—which are nearly verbatim to those in his opposition brief—in Schwartz's declaration. *See, e.g., Pacenza v. IBM Corp.*, No. 04 Civ. 5831 (SCR), 2007 WL 9817926, at *2 (S.D.N.Y. July 26, 2007) (striking paragraphs from a declaration constituting "argument and analysis" as "wholly inappropriate for a declaration"), *aff'd*, 363 F. App'x 128 (2d Cir. 2010).

that he "got paid time and a half for some of those weeks," but does not specify which weeks.  *Id.* ¶ 12.

Janice Stroughter, who was Associate Commissioner of Human Resources at DDC at the time of Schwartz's employment, testified that the City typically paid out accrued compensatory time at the time of an employee's termination.  Def. 56.1 Stmt. ¶ 76; *see* Dkt. 75, Exh. H ("Stroughter Dep. Tr.") at 28:6-12.  Similarly, Schwartz testified that he was told that his compensatory time "would be paid out" after his employment ended.  Schwartz Dep. Tr. at 28:23-25.

Schwartz was arrested on May 27, 2017, and DDC terminated him the following day because of this arrest.  Def. 56.1 Stmt. ¶¶ 54-56.  Schwartz eventually pleaded guilty to promotion of a sexual performance of a person under seventeen years of age, and was also charged with possession of a sexual performance of a minor, to which he did not plead guilty.  *Id.* ¶ 57.  Following his arrest, the City declined to pay Schwartz for his accrued compensatory time.  *Id.* ¶ 77.  The City contends this was because of what it considered the "egregious nature of his criminal charges" and because some individuals believed that Schwartz had viewed pornography depicting minor children during work hours and on a work computer.  *Id.*; Pl. Counter 56.1 ¶ 77; Stroughter Dep. Tr. at. 31:5-33:19.  It is not clear if the City in fact found child pornography on Schwartz's computer.  Pl. Counter 56.1 ¶ 77.

**B.  Procedural History**

Schwartz filed his Complaint on June 3, 2019.  Dkt. 1.  This case was originally assigned to the Honorable Analisa Torres.  Schwartz filed a First Amended Complaint on June 4, 2019, Dkt. 7; a Second Amended Complaint on July 15, 2019, Dkt. 15; and a Third Amended Complaint on August 28, 2019.

The Third Amended Complaint alleged that by failing to pay Schwartz overtime pay for the time he worked in excess of forty hours a week, the City violated the FLSA and section 12-108 of the New York City Administrative Code.  Third Am. Compl. ¶¶ 16-21.  It also alleged that the City breached an oral contract when it failed to pay Schwartz for the compensatory time he had accrued for work in excess of thirty-five hours per week, as his supervisors had allegedly promised.  Id. ¶¶ 22-25.  Finally, the Third Amended Complaint brought an unjust enrichment claim for the value of Schwartz's compensatory time.  Id. ¶¶ 26-28.

On September 20, 2019, the City moved to dismiss the Third Amended Complaint.  Dkt. 25.[6]  Judge Torres referred this case to the Honorable Stewart D. Aaron for general pretrial purposes and for a Report and Recommendation on the motion to dismiss.  Dkt. 44.  On January 22, 2020, Judge Aaron issued a Report and Recommendation, which recommended that the City's motion be denied as to Schwartz's FLSA claim but granted as to Schwartz's claim under section 12-108 of the Administrative Code and as to his breach of contract and unjust enrichment claims.  Dkt. 52.  On February 3, 2020, Schwartz filed objections to the Report and Recommendation.  Dkts. 53, 54. On February 11, 2020, the City opposed those objections.  Dkt. 55.  On June 3, 2020, Judge Torres overruled Schwartz's objections and adopted the Report and Recommendation.  Dkt. 62.

On September 4, 2020, the City filed a motion for summary judgment on Schwartz's single remaining FLSA claim.  Dkts. 74, 77 ("Motion").  In support of its motion for summary judgment, the City submitted various documents, including the transcripts from the depositions of Christine Flaherty, the Associate Commissioner of DDC while Schwartz was employed there, see Dkt. 75,

---

[6] The City did not move to dismiss on the basis that Schwartz was an exempt employee—an argument that forms the basis of its summary judgment motion—because the City recognized the fact-intensive nature of that inquiry.  See Dkt. 26 at 4-5.

Exh. C ("Flaherty Dep. Tr."); Schwartz, *see* Schwartz Dep. Tr.; and Janice Stroughter, *see* Stroughter Dep. Tr.  On December 8, 2020, Schwartz filed his opposition.  Dkts. 91, 93, 94 ("Opposition").  In support of his opposition, Schwartz submitted, among other things, the deposition transcript of Mohammed Haque, Schwartz's immediate supervisor, Dkt. 89, Exh. A ("Haque Dep. Tr."), and Michael Kenny, a project executive at DDC while Schwartz was employed at the City, *id.*, Exh. B ("Kenny Dep. Tr.").  On January 15, 2021, the City submitted its reply.  Dkt. 97.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'"  *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New*

*York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted). The non-movant must present more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252. "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

## III.   Discussion

The City moves for summary judgment on the remaining FLSA claim, arguing that (1) Schwartz was properly classified as exempt from the overtime provisions of the FLSA under both the so-called "administrative exemption," 29 U.S.C. § 213(a)(1), and the "computer employees exemption," *id.* § 213(a)(17), or (2) alternatively, even if Schwartz was not exempt, the record is devoid of evidence showing that the accrued compensatory time here is entitled to the protections of the FLSA.

## A. Applicable Law

"Congress enacted the Fair Labor Standards Act some eighty years ago in order to correct 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018) (quoting 29 U.S.C. § 202(a)). The FLSA thus imposes substantive wage, hour, and overtime standards, including requiring employers to pay their employees overtime compensation for time worked over forty hours in one week. *Id.*; 29 U.S.C. § 207(a).

However, Congress exempted categories of employees from this requirement. For purposes of this Opinion and Order, the "administrative exemption" is relevant.[7] That exemption applies to

---

[7] As noted, the City also moves for summary judgment on the grounds that Schwartz was exempt pursuant to the "computer employees exemption," which, subject to certain exceptions, exempts a "computer systems analyst, computer programmer, software engineer, or other similarly

an employee who works in a "bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). The employer bears the burden of demonstrating an exemption applies. *Flood*, 904 F.3d at 227.

Until recently, the Second Circuit counseled that courts should narrowly construe FLSA exemptions in light of the statute's remedial purpose. *See id.* at 228 (citing *Reiseck v. Universal Commc'ns of Mia., Inc.*, 591 F.3d 101, 104 (2d Cir. 2010); and then citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). However, the Supreme Court recently rejected this approach, stating that "[t]he narrow-construction principle relies on the flawed premise that the FLSA pursues its remedial purpose at all costs." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks omitted). Instead, because exemptions are "as much a part of the FLSA's purpose as the overtime-pay requirement," courts must give the exemption "a fair reading." *Id.*; *see Flood*, 904 F.3d at 228. When determining whether an exemption applies, the question of what tasks an employee performed is a question of fact whereas the question of whether an employee's activities are exempt is a question of law. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).

The FLSA exempts from overtime pay requirements employees who work in "bona fide . . . administrative . . . capacit[ies]." 29 U.S.C. § 213(a)(1). This exemption applies to "any employee" (1) who is compensated on a salary or fee basis" at a certain rate, which at the time of Schwartz's employment was at least $455 per week;[8] (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the

---

skilled worker." 29 U.S.C. § 213(a)(17); 29 C.F.R. §§ 541.400-.402. Because the Court concludes that there is no genuine issue of material fact with respect to whether Schwartz fell under the "administrative exemption," it does not reach whether he also fell under the "computer employees exemption."

[8] As of January 1, 2020, the relevant threshold is $684 per week.

employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

The federal regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* When assessing the primary duty of an employee, courts should consider "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* While the time spent on exempt work is a "useful guide," it is not determinative. *Id.* § 541.700(b).

**B. Analysis**

Schwartz does not offer any arguments challenging his satisfaction of the first two prongs of the test. *See* Opposition at 11-16 (contesting only the third prong of the exemption). Nor could he. First, Schwartz's two roles both met the weekly salary threshold in place at the time. Schwartz was initially hired as a Project Manager Intern on May 4, 2015, with a starting salary of $52,000. Def. 56.1 Stmt. ¶ 15; Dkt. 75, Exh. A. He was then promoted to a Computer Programming Analyst II in May 2016, with a salary of $66,360.00. Def. 56.1 Stmt. ¶¶ 30-31.

Second, Schwartz's "primary duty" was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200. The federal regulations define this as work "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.*

§ 541.201(a); *see Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531-32 (2d Cir. 2009).   It includes various "functional areas," such as budgeting; auditing; quality control; procurement; computer network, internet, and database administration; and "similar activities."   29 C.F.R. § 541.201(b).   The Second Circuit has distinguished "employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business," only the latter of which falls under the administrative exemption.  *Davis*, 587 F.3d at 535.

Schwartz testified that he was unofficially "the lead project analyst" on the BIB project. Schwartz Dep. Tr. at 47:25-48:1.  In that role, Schwartz performed a variety of tasks, including tracking project data, *id.* at 15:4-14, working with subcontractors to "[h]elp[] clarify project parameters" and "check[] to make sure that they had filed the proper paperwork to be considered for various pieces of the job," *id.* at 34:22-35:18, and vetting work orders, *id.* at 37:2-23.  Schwartz also frequently met with and advised the Associate Commissioner and other officials.  *Id.* at 48:4-7, 56:15-17.  The record does not reflect that Schwartz was involved in selling products or in the "production" of the BIB Program's output.  Thus Schwartz's work was plainly "related to assisting with the running or servicing of the business."  29 C.F.R. § 541.201(a).

Schwartz contests only the third prong of the "administrative exemption," asserting that there are issues of fact as to whether his "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance."  *Id.* § 541.200; Opposition at 11. The relevant federal regulations explain that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).

The federal regulations counsel that "[t]he phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." *Id.* § 541.202(b).  Factors to consider include: (1) "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices"; (2) "whether the employee carries out major assignments in conducting the operations of the business"; (3) "whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business"; (4) "whether the employee has authority to commit the employer in matters that have significant financial impact"; (5) "whether the employee has authority to waive or deviate from established policies and procedures without prior approval"; (6) "whether the employee has authority to negotiate and bind the company on significant matters"; (7) "whether the employee provides consultation or expert advice to management"; (8) "whether the employee is involved in planning long- or short-term business objectives"; (9) "whether the employee investigates and resolves matters of significance on behalf of management"; and (10) "whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." *Id.*; *see Isett v. Aetna L.fe Ins. Co.*, 947 F.3d 122, 130 (2d Cir. 2020).

The employee must have "authority to make an independent choice, free from immediate direction or supervision," but "can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c).  However, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e).  It does not include "clerical . . . work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." *Id.*

The evidence in the record—primarily Schwartz's own testimony—reflects that Schwartz's primary duties went beyond simply tabulating data and instead involved exercising discretion and independent judgment.[9]  First, Schwartz had the authority to formulate and implement operating practices for DDC's BIB Program and did so without direct instruction.  Most prominently, Schwartz played an important role in developing data tracking and collection methods within the BIB Project.  Schwartz testified that the team initially calculated certain metrics by hand, Schwartz Dep. Tr. at 42:20-23, and then collected their data in "very crude Excel spreadsheets," *id.* at 40:5-7.  Schwartz attested that, on his own initiative, he "built from the ground up" a "sophisticated data tracking system" that permitted DDC to report on "hundreds of metrics in a very, very quick fashion."  *Id.* at 40:3-12, 41:1-10; *see generally id.* at 42:8-25, 43:1-3.  Schwartz "designed" Excel workbooks to "automatically calculate[] various metrics."  *Id.* at 41:2-10.  Schwartz testified that the development of this new system "was a constant ongoing thing" and that he and others adapted it to the needs of the team.  *See id.* at 44:6-14 ("It was like they need a new metric, okay, how are we going to generate that metric, come up with a solution, and develop reports to get that metric out . . . .").  By the time Schwartz left, this system produced five or six different reports on a daily basis.  *Id.* at 43:7-14.  This work was critically important to the project:  Christine Flaherty attested that the daily report "was used by all of us to see where we were across over a thousand homes and all three boroughs."  Flaherty Dep. Tr. at 14:4-7.

Schwartz does not appear to argue that the development of a sophisticated tracking system, on one's own initiative, does not reflect the exercise of independent discretion.  Instead, he attempts

---

[9] Schwartz testified that he performed the duties of a Project Manager Intern only for the first month of his employment.  Def. 56.1 Stmt. ¶ 26.  To the extent those duties differed from his primary duties explained in this Opinion and Order, it is immaterial to the resolution of this case, as the time records Schwartz provided reflect that he did not work more than forty hours during any of his first five weeks of employment.  *See* Schwartz Declaration, Exh. 1 at 1.

to downplay his role. Schwartz contends that it "is extremely misleading" to describe this tracker as a "sophisticated tracking system" and that "[n]o witness used the words 'sophisticated data tracking system.'" Opposition at 14. But this is in direct conflict with the record: Schwartz *himself* called it a "sophisticated data tracking system" during his deposition. Schwartz Dep. Tr. at 40:3-12; *see* Motion at 13-14. "Any 'minimization of the level of [Schwartz's] work' in his summary judgment submissions is thus 'directly contradicted by his own assessment of his accomplishments' in his testimony." *S.ji Yu v. Knighted LLC*, No. 15 Civ. 9340 (KMK), 2019 WL 2085990, at *8 (S.D.N.Y. May 13, 2019) (quoting *Mock v. Fed. Home Loan Mortg. Corp.*, No. 13 Civ. 1292 (LMB), 2014 WL 3545096, at *2 (E.D. Va. July 15, 2014), *aff'd*, 589 F. App'x 127 (4th Cir. 2014)), *aff'd*, 811 F. App'x 55 (2d Cir. 2020). Schwartz cannot simply deny or ignore his own testimony in an effort to avoid summary judgment.

And Schwartz's other work reflected significant latitude for judgment on matters vital to both short- and long-term business objectives. For instance, Schwartz was involved in helping the BIB Project run by ensuring that subcontractors were properly assigned to the appropriate projects. Schwartz repeatedly downplays his role here as well, arguing that he did not "manage" any subcontractors or work-order vetting. *See, e.g.*, Pl. Counter 56.1 Stmt. ¶¶ 35-36; Schwartz Declaration ¶ 2. But Schwartz testified during his deposition that he and a couple other people did "most" of the work-order vetting, Schwartz Dep. Tr. at 37:2-23, which involved working with approximately one hundred subcontractors to "[h]elp[] clarify project parameters" and "check[] to make sure that they had filed the proper paperwork," *id.* at 35:1-18, as well as resolving issues that arose during that vetting, *id.* at 37:24-38:11. He initially did this with two of the design project managers, *id.* at 37:2-9, before doing it with Fabian Perez and then Victoria Kravits, *id.* at 37:10-14. Schwartz testified that he and Perez "work[ed] basically hand-in-hand," *id.* at 49:24-50:2, and

that Kravits was "like an assistant to [him]," *id.* at 50:3-6.  Thus the record reflects Schwartz's substantial role in the work-order vetting process.

The other testimony in the record confirms this.  Flaherty testified that Schwartz was vital to ensuring that the information was accurate so that houses could be assigned to construction management organizations at the right time.  Flaherty Dep. Tr. at 13:5-14:4, 15:13-16:6.  And Kenny, a project executive at DDC whose testimony Schwartz submitted in opposition to the City's motion, emphasized that Schwartz was "involved from day one" in tracking each individual project, and if a project "wasn't moving, [Schwartz] would be raising the red flag to figure out what was going on to put pressure on the contractors."  Kenny Dep. Tr. at 21:24-22:8.  In other words, Schwartz identified issues that needed remedying and worked to resolve some of these issues— Schwartz and Kenny "would be pushing the contractors to start getting up there and getting out there . . . to show the people in the communities that we were actually going to do something."  *Id.* at 24:7-13.  In doing this, Schwartz worked with various sectors of the City government, including DDC's regional offices, and construction management firms.  *Id.* at 25:8-19, 27:2-10.  This all reflects Schwartz's ability to exercise independent judgment as to important issues.  *See, e.g.*, *Grupke v. GFK Custom Rsch. N. Am.*, No. 13 Civ. 913 (PAC), 2015 WL 363589, at *7 (S.D.N.Y. Jan. 28, 2015) (finding that an employee met the administrative exemption in part because she "carried out major assignments in conducting the operations of the business," including "coordinat[ing] studies, identif[ying] opportunities for improvements, and implement[ing] changes that increased efficiencies").

Schwartz was also involved in making cost projections.  He would "project how much money it would cost to do all of the projects based off of" individual estimations his team received

as to the cost of the average project. Schwartz Dep. Tr. at 55:15-21.[10] Schwartz testified that he would "adjust the budgeting" based on the projects his team was assigned. *Id.* at 56:3-6. While the record does not reflect that Schwartz had decision-making authority over where the funds should be spent, it does reflect Schwartz's involvement in a "major assignment" that was important to the long-term growth of the business. *See Krumholz v. Village of Northport*, 873 F. Supp. 2d 481, 489 (E.D.N.Y. 2012) (finding a town treasurer to be exempt under the administrative exemption based, in part, on her role in drafting a budget, a "major assignment" that demonstrates authority to implement management policies or operating practices and indicates involvement in long- and short-term business objectives).

In addition, Schwartz counseled high-level City officials on matters important to both the daily operations and the long-term health of the project, and worked to develop data solutions to address management's needs. Schwartz testified that he was unofficially "the lead project analyst." Schwartz Dep. Tr. at 47:25-48:1. In this unofficial role he "frequently" wrote short statements and drafted PowerPoint presentations for the Assistant Commissioner, *id.* at 39:19-40:1, and "directly advise[d]" the Assistant Commissioner "[a]lmost daily," *id.* at 56:15-17. He also met with other City officials, as he was "frequently called upon to sit and meet with the [A]ssociate [C]ommissioner, the [C]ommissioner himself, [and] the head of the Housing Recovery Office[,]" and "attended meetings at City Hall several times with the [D]eputy [M]ayor." *Id.* at 48:4-7.

Flaherty attested to the importance of Schwartz's work and counsel. Flaherty testified that Schwartz "helped develop a number of various analyses tools . . . to further understand what some of the key risks and challenges were on a program that's incredibly dynamic and complex."

---

[10] Schwartz states that "[h]e did not testify that he would create cost projections." Pl. Counter 56.1 ¶ 52. But his relevant testimony, which is repeated here, states that he would "project . . . cost[s]." Schwartz Dep. Tr. at 55:19-21.

Flaherty Dep. Tr. at 14:4-14.  She also testified that Schwartz "developed very good tools to help us look at what was the average time frames for [the completion of construction of] various houses being managed by" different construction management firms.  *Id.* at 22:3-7.  This is not simply tabulating or entering data—it is exercising discretion to resolve management's problems.  As Flaherty emphasized, Schwartz "was a very critical member of the project controls team," as he "help[ed] us gather information and synthesize the information into reporting that could be understood by many," and "helped us, from a management perspective, use those tools to further manage the program and try to continue to push for progress."  *Id.* at 13:5-12.

The Court thus concludes that, as a matter of law, Schwartz's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).  Because the two other factors are uncontested and clearly satisfied, *i.e.*, that (1) Schwartz earned a salary of at least $455 per week and (2) his "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," the Court finds that Schwartz is exempt from the FLSA under the "administrative exemption."  Because it rules on this ground, the Court does not address the City's remaining arguments in favor of summary judgment.

### IV.  Conclusion

For the foregoing reasons, the Court grants the City's motion for summary judgment.  The Clerk of the Court is respectfully directed to terminate all motions and close this case.

SO ORDERED.

Dated: September 24, 2021
      New York, New York

JOHN P. CRONAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
JACOB SCHWARTZ,

                                    Plaintiff,                    19 **CIVIL** 5204 (JPC)

                -against-                                         **JUDGMENT**

THE CITY OF NEW YORK,

                                    Defendant.
-------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated September 24, 2021, the City's motion for

summary judgment is granted; accordingly, the case is closed.


**Dated:**  New York, New York
         September 24, 2021



                                                **RUBY J. KRAJICK**
                                            _____
                                                **Clerk of Court**
                                **BY:**
                                                *Kmango*
                                            _____
                                                **Deputy Clerk**

| STATE OF NEW YORK | ) | | **AFFIDAVIT OF SERVICE** |
|---|---|---|---|
| | ) | ss.: | **BY OVERNIGHT FEDERAL** |
| COUNTY OF NEW YORK | ) | | **EXPRESS NEXT DAY AIR** |

I, Tyrone Heath, 2179 Washington Avenue, Apt. 19, Bronx, New York 10457, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

**On December 30, 2021**

deponent served the within: **BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT**

upon:

**New York City Law Department**
**Lorenzo Di Silvio**
**100 Church Street**
**New York, New York 10007**
**212-356-1671**

the address(es) designated by said attorney(s) for that purpose by depositing **1** true copy(ies) of same, enclosed in a properly addressed wrapper in an Overnight Next Day Air Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of New York. This document was also submitted via the CM/ECF Case Filing System. Filing and service were performed by direction of counsel

**Sworn to before me on December 30, 2021**

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2022          **Job#  309632**